688 A.2d 527

**Donald BRADLEY et al.**

v.

**Martin A. FISHER et al.**

**No. 752, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 5, 1997.

Kevin Karpinski (Daniel Karp and Allen, Johnson, Alexander & Karp, on brief), Baltimore, for appellants.

Harry M. Walsh, Jr. (Harold P. Pugh, and Walsh & Phillips, P.A., on brief), Easton, for appellees.

Argued before CATHELL, SALMON and EYLER, JJ.

CATHELL, Judge.

Appellants, Donald Bradley, the mayor or former mayor of Hurlock, and apparently a member of the Hurlock "police commission," and Wendell Travers, the former chief of police

of Hurlock,[1] filed separate motions for summary judgment with attached memoranda of law. Bradley's Motion and Memorandum was over forty pages long; Travers's was over sixty-five pages long. In each motion was a request for summary judgment based on immunity grounds. Bradley's immunity assertion and argument began on page thirty-one of his motion, and Travers's began on page forty-seven. The Circuit Court for Dorchester County denied both motions. In their Notice of Appeal, appellants appealed "from the Court's Order of April 3, 1996, denying their motions for summary judgment on immunity grounds and all other adverse rulings." We shall address only the immunity arguments.

We are aware that in the recent collateral order doctrine case of *Montgomery County v. Stevens*, 337 Md. 471, 654 A.2d 877 (1995), the Court of Appeals opined that because, under the collateral order doctrine, judgments rendered under it were considered final, other adverse rulings could also be resolved pursuant to Maryland Rule 8–131(d), which provides that on an appeal from a final judgment interlocutory orders may be reviewed. We do not perceive, however, that the language utilized by the *Stevens* Court was intended by it to *require* this Court to resolve completely all other interlocutory adverse rulings, in addition to an adverse ruling on an immunity issue, when the immunity issue is believed to authorize an immediate appeal.

■ While an order granting summary judgment in favor of all defendants on immunity grounds would be a final judgment, an order denying such a motion is not a *final order*. An interlocutory appeal is permitted only because, if complete and absolute immunity exists, it may, under certain circumstances, encompass the right to be immune from the trial process itself, and, thus, if an immunity claim is wrongfully denied, absent an immediate appeal, the right not to be tried, if it exists, is lost. We also point out that a denial of a motion

---

1. Appellants fail to identify either Bradley or Travers early in their brief (briefs). Eventually, we realized that at all relevant times Travers was the chief of police of Hurlock and Bradley the mayor.

based upon immunity grounds is *not required* to be immediately appealed. It may be appealed after the conclusion of the entire case, should an appellant so choose.

If we reverse the trial court on the immunity issue, the other alleged "adverse rulings" are, so long as our holding is not reversed by higher authority, of no importance. While appellants, in the event we were to affirm the trial court's action, might like us to act as an advisory body in respect to the trial court's other interlocutory rulings, we shall decline to do so. In plain terms, this case is in a procedural morass. Were we to affirm the trial court on the immunity issue and attempt to resolve the other interlocutory issues as well, we would accomplish little. The case, considering the disparate causes of action and the fact that it has not yet been tried, would merely revert to its former posture, be tried, and, more likely than not, then be appealed again. We decline to do that now since we are probably going to have to do it later in any event. Such a procedure as suggested would circumvent the purpose of Maryland Rule 2–602 and would improperly result in piecemeal appeals.

Turning to the case *sub judice*, the trial court succinctly set forth the general facts underlying this multiparty and multiclaim case in its opinion in respect to a prior motion to dismiss:

> In legal circles, an action brought by several individuals, against several defendants, on the basis of multiple causes of action, is often referred to as the "shotgun approach." This is such a case. Here seven seemingly dissociated individuals have brought this action to recover damages from wrongs allegedly visited upon them by the town of Hurlock, Maryland (Mayor and Council of Hurlock, Inc.), its Mayor (Donald Bradley), its police chief (Wendell Travers), and its "Police Commission."

> The individual Plaintiffs may be viewed as being three distinct groups: former officers of the Hurlock Police Department (H.P.D.), a present H.P.D. officer, and two individuals who are not, and have never been, Hurlock police

officers. They have joined forces to fire a "shotgun" blast at the Defendants, through a Complaint and Amended Complaint embodying twelve counts and at least five different causes of action, some of which apply to all Defendants, some to only one of the Defendants, and each of which applies to only one of the Plaintiffs.

The matter is presently before the Court on Motions of the respective Defendants to dismiss the action; in effect, to determine whether Plaintiffs have used the wrong ammunition and/or aimed at the wrong targets.

The factual averments of the various counts are tied together by a common thread, or theme, woven into and underscoring each count: that Hurlock's police chief, Wendell Travers (Chief Travers) regularly and systematically engaged in illegal and wrongfully abusive actions in performance of his duties and powers as police chief, encouraged and even required his officers to do likewise, and established a "code of silence" forbidding his officers to reveal or even discuss such activities to or with others. A secondary theme, running through many of the counts, avers that the town (through its Mayor and Council) and its mayor were aware of the alleged activities and that they not only failed to take corrective action, but also participated with and assisted the police chief in retaliating against those officers who broke the "code of silence" by reporting the unlawful activities to the mayor and/or councilmen, and to other legal authorities (including the State's Attorney for Dorchester County and the State Prosecutor). The various individual counts are but minor variations in which the themes are more or less adapted to the particular wrong complained of in the count.

Generally, the former officers seek damages for wrongful discharge. They allege that they were fired from H.P.D. because they refused to obey illegal commands and because they reported the chief's activities to others. Apparently they were "rookies" still serving as at-will employees in a "probationary status" when their employment was terminated. One officer, Sgt. Thomas Wolf, was a veteran officer

with vested rights under the Law Enforcement Officers' Bill of Rights. His complaint is that, because he could not be cavalierly fired, he was subjected to harassment and the intentional infliction of emotional distress by the Chief (with the complicity of the mayor and Town Council). He also claims to have been slandered by the Chief. The two "private citizens" Plaintiffs allege that they were illegally arrested, unlawfully detained, and otherwise tortiously wronged by the Chief and by officers acting under his direct supervision and orders. [Footnotes omitted.]

The trial judge dismissed the action against the Town of Hurlock on the grounds that it did not receive the 180–day notice required by the Local Government Tort Claims Act, Md.Code (1973, 1995 Repl.Vol.), § 5–404 of the Courts & Judicial Proceedings Article, and, accordingly, sovereign immunity barred the action. The trial court also dismissed the Hurlock police commission from the case because it had, and continues to have, no legal existence. No appeal from those rulings has been taken.

As alluded to in the trial court's opinion, the various counts allege wrongful discharge, failure to supervise, assault, false imprisonment, defamation, and a multitude of other related and unrelated wrongs against police officers, in addition to other unrelated offenses allegedly committed against several private citizens. Questions of misjoinder arise out of what the trial court described as appellees' "shot gun approach." The most temperate judicial language we can use to describe the pretrial nature of this case is that it is a mess.[2] Appellants, by raising non-immunity issues on appeal, relating to the underlying claims of wrongful/constructive discharge, slander, intentional infliction of emotional distress, false arrest, and false

---

2. Separate and independent wrongful discharge cases by several former and present employee-plaintiffs, alleging, in most instances, different acts of different defendants, are somehow joined together. Moreover, what appear to be completely separate claims of private citizens, which are unrelated to any employment status of the police plaintiffs, are joined in the same action. How all of these actions can be tried in one case is, to understate, not altogether clear.

imprisonment, invite us early to the table. We decline the invitation and shall address only the immunity issues, firm in our belief that during any subsequent trial below, counsel and Judge Warren would or will be able to clarify the issues and enable counsel, if necessary, to present clear appellate issues after the final judgments are rendered.

## Immunity

Appellants present their immunity arguments in three places in their brief. In argument I., argument II.c., and argument V.c. Argument I. alleges that Bradley and Travers are entitled to public official immunity from all of the actions filed against them by all of the appellees because "Appellees did not cite to any specific material facts in dispute . . . [and] did not cite to any specific actions taken by Appellants to strip them of the protection of public official immunity." Argument II.c. is the same but, because it is directed at the "wrongful and/or constructive discharge" claims, would be limited to the present and former employee-appellees. Argument V.c. applies only to the citizen-appellees, McWilliams and Hill, and the claims filed by them against Travers. Presumably, this argument is based on the same premise, as it is prefaced by "as discussed above."

## Standard of Review

In reviewing the grant or denial of a summary judgment motion, we are concerned with whether a dispute of material fact exists. *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365 (1989); *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Markey v. Wolf,* 92 Md.App. 137, 170–71, 607 A.2d 82 (1992). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d 608 (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974)). "A dispute as to a fact 'relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of

summary judgment.' " *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 242–43, 603 A.2d 1357 (1992) (quoting *Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 40, 300 A.2d 367 (1973)) (emphasis in original). We have further opined that in order for there to be disputed facts sufficient to render summary judgment inappropriate "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 244, 603 A.2d 1357.

The Court of Appeals has also stated that "the proper standard for reviewing the granting of a summary judgment motion should be whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 592, 578 A.2d 1202 (1990) (citations omitted). The trial court, in accordance with Maryland Rule 2–501(e), shall render summary judgment forthwith if the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact that is sufficiently material to be tried. See *Coffey v. Derby Steel Co.*, 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia*, 287 Md. 302, 304, 413 A.2d 170 (1980). Thus, once the moving party has provided the court with sufficient grounds for summary judgment,

> [i]t is ... incumbent upon the other party to demonstrate that there is indeed a genuine dispute as to a material fact. He does this *by producing factual assertions, under oath,* based on the *personal knowledge* of the one swearing out an affidavit, giving a deposition, or answering interrogatories. "Bald, unsupported statements or conclusions of law are insufficient."

*Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 70, 509 A.2d 1239, *cert. denied*, 307 Md. 406, 514 A.2d 24 (1986) (citation omitted; emphasis added). With these considerations in mind, we turn to the case *sub judice*.

## Qualified Immunity

The appellants, the remaining defendants below,[3] asserted a qualified immunity defense. We first note that appeals of denials of immunity claims, while technically similar to collateral order doctrine cases, rest on another basis as well. The Court of Appeals, in *State v. Hogg*, 311 Md. 446, 456–57, 535 A.2d 923 (1988), noted:

> From the standpoint of being "effectively unreviewable" the erroneous rejection of sovereign immunity in bar of a claim *is similar to the erroneous denial of the protection against standing trial for the second time which is embraced in the privilege against former jeopardy. In that instance, an order denying a double jeopardy defense is immediately appealable. See Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034 [52 L.Ed.2d 651] (1977). Likewise, an order improperly failing to recognize the bar of sovereign immunity to a claim would effectively escape review if the sovereign were forced to stand trial on that claim and await final judgment before obtaining appellate review. Consequently, the collateral order doctrine permits immediate review here to determine whether the denial of the motion to dismiss the counterclaim erroneously deprived the State and its instrumentality ... of the protection of sovereign immunity. [Emphasis added.]

In *Artis v. Cyphers,* 100 Md.App. 633, 642, 642 A.2d 298 (quoting *Bunting v. State,* 312 Md. 472, 481–82, 540 A.2d 805 (1988)), *aff'd. mem.,* 336 Md. 561, 649 A.2d 838 (1994), we, nevertheless, stated

> that there were a number of immunity-type rights that, in a broad sense, could be regarded as trial-avoidance rights but which d[o] not permit interlocutory appeals, mentioning, among others, the States' right under the Eleventh Amend-

---

**3.** The Town of Hurlock's immunity motions were granted. No appeal was immediately taken by appellees. Thus, the actual employer of the employees-appellees is, at this point, no longer a party to this action. We shall not address the continuing presence of abusive or wrongful discharge claims in the absence of the employer.

ment to avoid being haled into Federal court as a defendant. [The *Bunting* Court] concluded,

> "In sum, the idea that an issue is not effectively reviewable after the termination of the trial because it involves a 'right' to avoid the trial itself, should be limited to double jeopardy claims and a very few other extraordinary situations. Otherwise, as previously indicated, there would be a proliferation of appeals under the collateral order doctrine. This would be flatly inconsistent with the long-established and sound public policy against piecemeal appeals."

The *Artis* Court then restated the concerns we had previously expressed about *State v. Hogg, supra,* in *Board of Trustees v. Fineran,* 75 Md.App. 289, 541 A.2d 170 (1988). Because of the manner in which the Court of Appeals affirmed *Artis,* we shall not repeat those concerns here.

In *Artis,* we noted that the plaintiffs had argued in their motion to dismiss the appeal

> the right to an immediate appeal from the rejection of an immunity defense should be limited to the rejection of a defense based on *absolute* immunity, which is resolvable as a matter of law, and should not be recognized when the defense is one of *qualified* immunity—either statutory or common law—which may be fact-based. They point out that the Court of Appeals has never approved (or disapproved) an immediate appeal from an interlocutory order rejecting a defense of qualified immunity, and they ask us to reconsider *Fineran* and, implicitly, [*Town of*] *Brunswick* [*v. Hyatt,* 91 Md.App. 555 [605 A.2d 620] (1992) ]. Relying on the reasoning expressed in Justice Brennan's dissenting Opinion in *Mitchell v. Forsyth,* 472 U.S. 511, [105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ], they urge in their brief that qualified immunity is "inextricably bound with the merits of the action and thus in no sense collateral to the ultimate question on the merits."

This argument implicates the third criterion in the collateral order analysis—whether the decision appealed is com-

pletely separate from the merits of the action—at least as much, if not more, than the fourth criterion expounded upon in *Hogg.* There is much to be said for it, and, as we earlier indicated, we made essentially the same point in *Fineran.* *Hogg,* however, as confirmed in [*State v.*] *Jett,* [316 Md. 248, 558 A.2d 385 (1989) ] *seems* to preclude the drawing of that kind of distinction.

100 Md.App. at 646, 642 A.2d 298 (some emphasis added).

We then discussed at some length *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), which addressed the appealability of rejections of qualified immunity defenses. In *Mitchell,* the prior Supreme Court case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), was itself discussed and construed. We, in *Artis,* commented:

> The *Mitchell* Court continued, [472 U.S.] at 526, 105 S.Ct. at 2815:
>
>> "... *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, *conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law.* The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

100 Md.App. at 649–50, 642 A.2d 298. Then, in *Artis,* we noted that the *Mitchell* Court referred to the other elements of the collateral order doctrine that include "whether it is collateral to the rights asserted in the action." *Id.* at 651, 642 A.2d 298. We then expressed our interest in this factor. We concluded our discussion of Mitchell itself by stating:

> The plurality view in *Mitchell v. Forsyth* may be entirely appropriate when the qualified immunity at issue is that stated in *Harlow,* for the very reasons stated in Part III of the *Mitchell* Opinion. To take the plurality holding out of that context, however, and apply to it every form of common law or statutory qualified immunity that exists in Maryland

is neither compelled nor rational. In *Harlow,* the Court "refashioned" the public immunity doctrine to cleanse it of subjective elements and present a unitary objective standard. That, and that alone, it seems to us, is what allowed the four Justices in *Mitchell* to view the issue presented in an immediate appeal as being purely legal in nature and thus not requiring the appellate court, at that preliminary stage of the litigation, to become immersed in the underlying factual claims and responses.

*Artis,* 100 Md.App. at 651–52, 642 A.2d 298. We continued:

That indeed, seems to be how the Federal appellate courts have construed *Mitchell.* Where the qualified immunity being asserted is the *Harlow* immunity *and its existence does not hinge on unresolved disputed facts,* immediate appeals have been allowed. *Clark v. Link,* 855 F.2d 156 (4th Cir.1988); *Childress v. Small Business Admin.,* 825 F.2d 1550 (11th Cir.1987); *Tomer v. Gates,* 811 F.2d 1240 (9th Cir.1987); *Huron Valley Hosp. v. City of Pontiac,* 792 F.2d 563 (6th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278 [93 L.Ed.2d 254] (1986); *Metlin v. Palastra,* 729 F.2d 353 (5th Cir.1984). Other courts have made clear, however, that, when "resolution of the immunity defense depends upon disputed factual issues, or upon mixed questions of fact and law, an immediate appeal will not lie, and review of the qualified immunity determination will have to await the [trial] court's resolution of the factual questions." *DiMarco v. Rome Hosp.,* 952 F.2d 661, 665 (2d Cir.1992) and cases cited therein. *Accord* [ ] *Gorman v. Robinson,* 977 F.2d 350, 354 (7th Cir.1992); *Crippa v. Dukakis,* 905 F.2d 553, 556–57 (1st Cir.1990); *Feagley v. Waddill,* 868 F.2d 1437, 1441–42 (5th Cir.1989). The appeals in those cases were dismissed.

As we have observed in our discussion of the immunity grounds asserted by Mr. Artis, we are not being presented here with wholly legal issues. Whether Artis enjoys the good samaritan immunity he claims will depend on whether his alleged negligence constituted gross negligence, a matter that is in sharp dispute. Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for

the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence. *Romanesk v. Rose*, 248 Md. 420, 423 [237 A.2d 12] (1968); compare *Boyer v. State*, 323 Md. 558 [594 A.2d 121] (1991) and *Boucher v. Riner*, 68 Md.App. 539 [514 A.2d 485] (1986), where the facts, as pled or presented on summary judgment, were found to be legally insufficient to warrant a finding of gross negligence.

A similar situation exists with respect to the common law qualified immunity asserted by Artis; that, too, depends on a number of fact-specific elements—those relating to whether he is a public official, whether he was engaged in discretionary as opposed to ministerial acts, and whether his conduct, if negligent, constituted gross negligence. There are, already, disputes as to each of these factors.

The Court of Appeals, on more than one occasion, has looked to the plurality pronouncements in *Mitchell v. Forsyth* as persuasive authority, and we certainly can do no less. But we shall accept them in their proper context, as we believe the Court of Appeals intended to do, and not extend them to circumstances that are foreign, and indeed antithetical, to their underpinnings.

100 Md.App. at 652–53, 642 A.2d 298 (emphasis added).

We then held that while the issue of whether a particular defendant possesses qualified immunity will ultimately be resolved as a matter of law, if it depends on the "resolution of disputed material facts, . . . the existence of gross negligence or malice, for example," the finder of fact, in the case *sub judice*, the jury, must resolve that initial dispute. *Id.* at 653, 642 A.2d 298.[4]

As we earlier indicated, the Court of Appeals affirmed our decision in *Artis* in memorandum fashion. Had it wanted to allow our result in *Artis* without adopting our reasoning in respect to the real meaning of *Hogg*, it would have dismissed

---

**4.** Whether qualified immunity exists in the case *sub judice* depends upon the presence or absence of malice, not gross negligence.

the certiorari petition. Instead, it did not dismiss the appeal on the ground that certiorari had been improvidently granted. The Court of Appeals specifically stated, "For the reasons stated ... in *Artis v. Cyphers*, 100 Md.App. 633 [642 A.2d 298] (1994), the judgment is summarily affirmed." 336 Md. at 561, 649 A.2d 838 (1994). Because our reasoning was adopted by the Court of Appeals, it is the Court of Appeals's holding. It is the Maryland law. We conclude, therefore, that the *Hogg* decision has been modified by the Court of Appeals's affirmance of our *Artis*. Under certain circumstances, such as those extant here, issues involving qualified immunity may not always be immediately appealable. By denying appellants' immunity-based portion of their motions for summary judgment, the trial court has left the issue of resolving disputes as to the presence or absence of malice to the fact finder at trial. Under *Artis*, our only function is to determine whether there was a genuine dispute of material fact on those issues. We look primarily to the extract and the relevant pleadings contained therein.[5]

In responding to the motions for summary judgment, the appellees attached deposition testimony and incorporated it, and the allegations of their complaint as well as their previous responses to appellants' prior motion to dismiss. We have reviewed the allegations of the respective plaintiffs, appellees here. We include here only a summary of part of them.

There were assertions in the deposition testimony, or in answers to interrogatories of the various plaintiffs, that appellant, Travers, notified subjects under criminal investigation by his officers of the investigations, thereby thwarting his own officer's efforts; ordered some of the plaintiffs to lie on applications for search warrants (in one instance telling one of the officers to state in an application that a handgun had been used in a crime so that officers could then search drawers and

---

5. We note that appellants initially filed motions to dismiss, which alleged the same grounds. As to appellants' immunity claims, it was denied. They subsequently filed the motions for summary judgment that are the focus of this interlocutory appeal.

smaller places for narcotics when, in fact, the Chief had initially told the officer that a rifle, a long gun, had been used); ordered the officers to draft applications for warrants to search houses known by the chief not to be in the town of Hurlock, and thus beyond its jurisdiction; regularly used derisive racial epithets; forced subjects to sign over money to the department in return for the non-filing of criminal charges—even when the subject was not suspected of the crime; referred to the State's Attorney as a "cocksucker"; questioned some of the officers about their sexual relationship with "dates," *e.g.,* "Did she go down on the old boy," etc. One officer testified that the chief told him, "If you get a n . . . and you think he's done something and he won't admit it, just thump him a couple times and say a little white rabbit did it. . . ." Travers also allegedly told plaintiff Greeley that he was going to "fuck [Greeley] as a police officer and I would never gain employment as a police officer again." There were numerous other assertions of improper conduct on the part of the chief.

The facts incorporated into appellees' answers to appellants' motions for summary judgment also asserted that many of these allegations were made known to then Mayor Bradley, who, according to plaintiffs, chose not to do anything to rectify the problems.

Ultimately, the plaintiffs apparently brought these allegations, and others we have not specifically laid out, to the attention of the State's Attorney for Dorchester County and to the attention of the Special State Prosecutor. The officers alleged that their discharges and forced resignations resulted from the anger of appellants, Travers and Bradley, and malice resulting from the officers' efforts to have what they perceived as their supported complaints addressed by some appropriate authority.[6]

---

6. We have deliberately not included a blow-by-blow recounting of all of the various allegations.

At one point, Travers believed that Glenn had been complaining. Travers then took Glenn to Bradley's real estate office saying, "Nobody threatens me like that" and "You don't know who you're fucking with." There, Glenn discussed his possible resignation with Mayor Bradley and the chief, and the mayor told him that his probation was up in August, "If you want to leave that's your choice, as long as you do your two years with us." After they left Mayor Bradley's office, Travers explained to Glenn that if he left before the two years was up, he would have to pay Hurlock for his training—approximately $8,000.

Glenn was asked if he feared retaliation from Travers if he complained to Bradley, and he said "yes" because they were friends and because he and others had met with two councilmen and Mrs. Maloney, the State's Attorney, and then with the Special State Prosecutor.

Officer Martin Fisher testified, moreover, that "I talked to Mayor Bradley quite a few times at his office." He talked to the mayor about the chief's use of profanity and manner of addressing the officers. He says he told Bradley about the drug investigation problems. "I spoke to him about the drug investigations." He noted that Bradley "had the same answer all the time."

> Wendell [Travers] will be Wendell, Marty. Why don't you do your two years here, move on? A lot of guys do. A lot of guys use us to get to bigger and better agencies. Accept the fact.

Fisher noted that

> Mayor Bradley told me I needed to not rock the boat with Wendell. I needed to do my two years and go.... I needed to do my two years and move on if I wasn't happy.

At another point, Fisher noted that at some time during his employment he had been asked to sign a contract (apparently in regard to reimbursing Hurlock for his training) and initially refused to sign it. He testified that Mayor Bradley told him "Marty, if you don't sign it you're going down." He then signed it under duress. In interrogatories, Fisher asserted

that Travers's and Bradley's friendship caused them not to have a normal mayor-police chief relationship and that he felt that Bradley would reveal his confidences to Travers.[7] He noted that he was told "by members of the community that it was an on-going problem with Bradley failing to act against Travers."

Thomas Wolf, a drug task force member, testified in deposition that he went to Mayor Bradley or met with him three times and told him about the chief's "intelligence blackout." In answer to interrogatories, he stated that Mayor Bradley had been apprised of the "problems . . . with Chief Travers, and has refused to investigate or take any . . . action."

In answers to interrogatories, Mayor Bradley recalled a conversation with officer Fisher, wherein Fisher complained "in general terms about Chief Travers." On another occasion, Fisher (and perhaps Glenn) met with Bradley and "questioned . . . the Police Department's policies and procedures." Bradley informed them to take their complaints to Travers as it was Bradley's practice "not to become involved, outside of appropriate channels." He later voted for Fisher's termination because Fisher was "disrespectful to this supervisors . . . that Fisher had misrepresented certain matters" and had "failed timely to prepare and submit reports."

In deposition testimony, Mayor Bradley noted that because the State's Attorney's investigation and Special State Prosecutor's investigation did not result in any action, he did not "feel further action" needed to be taken. As to Fisher, he noted later that one of the reasons for Fisher's termination was that Fisher "probably was not ever going to get along with the police chief."

There was also testimony that the two appellants were friends. One of the plaintiffs alleged, "I've been told they go to parties together." Q. "Drinking alcohol?" A. "Yes. They

---

7.  David Greeley, Anthony Glenn, and Adam Nevins all testified similarly either in deposition or by interrogatories.

used to go out to parties and stuff like that ... sort of like A.C. Collins sticking up for O.J."

The record is replete with factual averments and depositional testimony and answers to interrogatories, etc., a sufficient number of which may be admissible at trial,[8] from which, if believed by the trier of fact, a sufficient inference of malice as to Chief Travers could be made. The evidence, and reasonable inferences therefrom, is much more tenuous as to Bradley. To some substantial extent, it is speculation. Whether a sufficient connection can ultimately be made in order to establish malice on Bradley's part may well be difficult. At this stage of the proceedings, however, the connection, minimal though it may be, is sufficient to withstand a motion for summary judgment where all inferences in favor of the persons against whom the motion is directed must be made.

We shall hold that that evidence presented to the trial court was sufficient to establish a genuine dispute as to a material fact, *i.e.*, the possible existence of malice as to all the remaining defendants, appellants herein. Under the circumstances of this case, the disputes over the existence of malice must be first resolved by the trier of fact. This appeal, therefore, is premature and shall be dismissed.[9]

**APPEAL DISMISSED; COSTS TO BE PAID BY APPELLANTS.**

---

8. Some of the averments we have mentioned may not ultimately be admissible, depending upon whether a proper foundation can be laid.

9. It may be that common-law public official immunity is not applicable due to ·the intentional nature of the alleged torts. Even if applicable, there would still be a requirement that actual malice exists. Section 5–321 of the Courts and Judicial Proceedings Article may provide immunity unless actual malice exists. In either event, "actual malice" is the key to maintaining the suit. We have held that a sufficient showing of actual malice has been made below to withstand the motion.