710 A.2d 345

Chantay NELSON

v.

Ramona F. KENNY, et al.

No. 458, Sept. Term, 1997.

Court of Special Appeals of Maryland.

May 27, 1998.

Samuel M. Riley (Paul T. Cuzmanes and Wilson, Elser, Moskowitz, Edelman & Dicker, on the brief), Baltimore, for appellant.

Raymond H. Simmons, Jr., Cambridge, for appellees.

Argued before HOLLANDER, KENNEY and BYRNES, JJ.

BYRNES, Judge.

This case arose out of an altercation between two students at Mace's Lane Middle School, in the City of Cambridge, on September 10, 1993. When teacher Ramona F. Kenny tried to intervene, one of the students hit her. The police were called and Officer Chantay Nelson, appellant, responded. After interviewing the students and Mrs. Kenny, Officer Nelson took Mrs. Kenny into custody and started to book her on charges of assault and battery. Before that process was completed, another member of the police force intervened, releasing Mrs. Kenny and telling her that "everything had been dropped." Mrs. Kenny subsequently received a letter of apology from the Cambridge City Police Chief.

Mrs. Kenny and her husband, Wade A. Kenny, appellees, sued Officer Nelson, the Cambridge City Police Department, the Commissioners of Cambridge, and the Board of Education of Dorchester County in the Circuit Court for Dorchester County alleging false arrest, false imprisonment, violation of Article 24 of the Maryland Declaration of Rights, and loss of consortium. Motions to dismiss were granted in favor of all of the defendants except for Officer Nelson. Officer Nelson then moved for summary judgment on the ground of public official immunity. When her motion was denied, she noted this interlocutory appeal. She presents the following question for review, which we have slightly rephrased:

Did the lower court err in denying summary judgment when appellees provided no evidence of actual malice sufficient to defeat appellant's public official immunity defense?

We conclude that this interlocutory appeal is not properly before us; accordingly, we dismiss it and remand the case for further proceedings.

### *Appellate Jurisdiction*

Ordinarily, an appeal may only be taken from a final judgment, *see* Md.Code Ann., (1995 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article ("C.J."), unless an interlocutory appeal is authorized by C.J. § 12–303 or the trial court expressly determines that there is no just reason for delay and directs the entry of final judgment as to one or more but fewer than all of the claims or parties, pursuant to Md. Rule 2–602(b).

The trial court's order denying Officer Nelson's motion for summary judgment in this case is not a final judgment under C.J. § 12–301 because it does not conclusively determine the rights of the parties. *Porter Hayden Co. v. Commercial Union Ins. Co.*, 339 Md. 150, 164, 661 A.2d 691 (1995). It also is not within the class of orders for which interlocutory appeals are permitted under C.J. § 12–303 and is not certified (and could not be certified) as a final judgment under Md. Rule 2–602(b). Accordingly, we may exercise appellate jurisdiction to review the order only if it falls within the extremely narrow class of interlocutory orders that are treated as final under the "collateral order doctrine," which was first recognized by the United States Supreme Court in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). For an order to be appealable under that doctrine it must:

1) conclusively determine the disputed question, 2) resolve an important issue, 3) be completely separate from the merits of the action, and 4) be effectively unreviewable on appeal from a final judgment.

*State v. Jett,* 316 Md. 248, 251, 558 A.2d 385 (1989); *Bunting v. State,* 312 Md. 472, 477, 540 A.2d 805 (1988); *Harris v. Harris,* 310 Md. 310, 316, 529 A.2d 356 (1987).

■ In *Bradley v. Fisher,* 113 Md.App. 603, 688 A.2d 527 (1997), we discussed the jurisdictional posture of interlocutory appeals from orders denying summary judgment on immunity grounds, brought under the collateral order doctrine:

> An interlocutory appeal [of the denial of a motion for summary judgment premised on immunity] is permitted only because, if complete and absolute immunity exists, it may, under certain circumstances, encompass the right to be immune from the trial process itself, and, thus, if an immunity claim is wrongfully denied, absent an immediate appeal, the right not to be tried, if it exists is lost.

*Id.* at 605, 688 A.2d 527. Absolute immunity, like the constitutional guarantee against double jeopardy, is a time-bound right that fits precisely the framework of the collateral order doctrine: it is an important issue separate and apart from the merits of the case that is effectively unreviewable on appeal from a final judgment because taking the case to a final judgment will destroy the right. *Mandel v. O'Hara,* 320 Md. 103, 134, 576 A.2d 766 (1990)(denial of ex-governor's motion to dismiss on grounds of absolute immunity is immediately appealable); *Parrott v. State,* 301 Md. 411, 421, 483 A.2d 68 (1984)(denial of motion to dismiss on grounds of double jeopardy is immediately appealable).

■ When the immunity claimed is a qualified immunity, not an absolute immunity, however, application of the collateral order doctrine is not as clear-cut, for two reasons. First, it may not be possible to determine whether the defendant is entitled to qualified immunity without resolving disputes of fact that go to the merits of the case. In that circumstance, the issue of qualified immunity is not "collateral," within the meaning of the collateral order doctrine: "When ... resolution of the immunity defense depends upon disputed factual issues, or upon mixed questions of fact and law, an immediate appeal will not lie, and review of the qualified immunity

determination will have to await the trial court's resolution of the factual questions." *Port Deposit v. Petetit*, 113 Md.App. 401, 414, 688 A.2d 54 (1997). Only when a qualified immunity defense can be decided without delving into and resolving disputed facts is an interlocutory order denying summary judgment sufficiently separate from the merits of the case to qualify as a collateral order. *Id.; Artis v. Cyphers*, 100 Md.App. 633, 652, 642 A.2d 298, *aff'd mem.*, 336 Md. 561, 649 A.2d 838 (1994). Second, even if the issue is truly collateral, the defense of qualified immunity may not be effectively unreviewable on appeal from a final judgment because it may not be tantamount to a right not to be tried. *Bunting*, 312 Md. at 481–482, 540 A.2d 805 ("the idea that an issue is not effectively reviewable after termination of the trial on the merits because it involves a 'right' to avoid the trial itself, should be limited to double jeopardy claims and a very few other extraordinary situations").

The statutory public official immunity on which Officer Nelson predicated her motion for summary judgment is found at C.J. § 5–321(b)(1). It provides:

*Nonliability of officials generally [ ... ]*—(1) An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

As this statutory language makes plain, public official immunity is qualified, not absolute. It may be defeated by proof of malice, *i.e.* affirmative evidence that the official " 'intentionally performed an act without legal justification or excuse, but with an evil or rancourous motive influenced by hate, the purpose being to deliberately injure the plaintiff.' " *Davis v. DiPino*, 99 Md.App. 282, 290, 637 A.2d 475 (1994), *rev'd on other grounds*, 337 Md. 642, 655 A.2d 401 (1995)(quoting *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985)); *Thomas v. Annapolis*, 113 Md.App. 440, 458–459, 688 A.2d 448 (1997); *Elliott v.*

*Kupferman,* 58 Md.App. 510, 526, 473 A.2d 960 (1984)(malice sufficient to defeat immunity under predecessor statute to C.J. § 5–321 must be an intentional act done knowingly for an improper purpose without legal justification or excuse). Statutory public official immunity shields the immunized party against liability for common law and State constitutional torts. *Davis v. DiPino, supra,* at 290–91, 637 A.2d 475.

Mr. and Mrs. Kenny do not dispute that at all times relevant to their claims, Officer Nelson was performing discretionary acts in furtherance of her public duties as a police officer. Their opposition to the immunity defense advanced by Officer Nelson in her motion for summary judgment rested solely on the ground that she did not act "without malice." The Kennys maintain that a genuine dispute of material fact exists on the issue of malice and that the issue is properly resolved by a jury. Officer Nelson argues, to the contrary, that the facts adduced in discovery are insufficient as a matter of law to generate a jury question on the issue of actual malice.

When it denied Officer Nelson's motion for summary judgment, the trial court explained: "It appears to the Court that the issue . . . is one of motive or intent, presence or absence of actual malice. And I find that this is a factual matter which is in dispute, so the motion is denied." If our examination of the record reveals that indeed there is a genuine dispute of material fact over whether Officer Nelson acted "without malice" and that resolution of the dispute hinges on the determination of factual findings integral to the merits of the case, then this appeal must be dismissed because it does not fall within the narrow confines of the collateral order doctrine. With that in mind, we turn to the record, reciting first the factual chronology that the Kennys argue gives rise to a dispute on the issue of malice and then the pertinent contentions made by Officer Nelson.

### *Factual Background*

On the day in question, Mrs. Kenny was standing outside of her classroom before the start of classes when she noticed a

large gathering of girls outside the door to Mrs. Joann Baker's classroom. Mrs. Kenny walked down the hall to investigate. She heard Lanielle Adams, a student, say "bitch" and saw another student, Lakita Pittman, enter Mrs. Baker's classroom. Adams followed Pittman into the classroom and Mrs. Kenny followed behind them. Mrs. Baker was not there. Mrs. Kenny then saw Adams throw Pittman against the wall and start punching her in the face.

Mrs. Kenny intervened by stepping between the two girls. Adams responded by turning away from Pittman and striking Mrs. Kenny, who fell backwards, landing on top of a group of desks about 12 feet away. Adams then resumed punching Pittman. Mrs. Kenny got up, buzzed the office intercom, and asked for the principal to come right away. At that point, Mrs. Wydella Thomas, another teacher, entered the classroom and pulled Adams off of Pittman. Mrs. Thomas took hold of Adams's arm and removed her bodily from the room. After Mrs. Kenny determined that Pittman was alright, the two left the classroom and headed for the school office.

Mrs. Kenny and Pittman encountered Principal John Hurley in the hall. Mrs. Kenny told Principal Hurley what had happened. They proceeded to the office and a short time later Principal Hurley took Mrs. Kenny into a room in which Adams and Pittman were seated. He questioned Adams, who admitted that she had hit Mrs. Kenny. He told Adams that her conduct constituted an assault on a teacher and that he was going to call the police to come and remove her from the building. Before making that call, Principal Hurley phoned Adams's mother, informing her of the incident and telling her that the police were about to be notified. He then called the police. Mrs. Kenny left and returned to her classroom.

Officer Nelson responded to the call. Principal Hurley told her what had occurred and asked her to arrest Adams and charge her with assault and battery against Mrs. Kenny. Officer Nelson interviewed Adams, who by then was in the company of her mother, Mrs. Adams–Travers. According to the police report later prepared by Officer Nelson, Adams admitted to punching Pittman but accused Pittman of starting

the fight. Mrs. Adams–Travers interrupted, saying that she wanted Pittman arrested and charged with assault and battery on her daughter. Adams continued her account, stating that Mrs. Kenny had approached the two girls as they were fighting and had grabbed her and pulled her upper right arm, leaving a bruise. Adams displayed a bruise on the upper portion of her right arm and said that her arm hurt. She then told Officer Nelson that she did not recall pushing or throwing Mrs. Kenny.

Mrs. Adams–Travers interjected once again, demanding that Mrs. Kenny be charged with assault and battery and use of excessive force. The police report describes her conduct: "Mrs. Adams–Travers ... was extremely angry fussing about being black being stepped on, used by white people and cussing that 'it does not make good god damn sense for a white teacher to grab a child like that and only one child, not both of the students, and if the teacher was not arrested and charged there would be hell to pay and that everybody would be sued.'" Adams, Pittman, Mrs. Adams–Travers, and Mrs. Thomas are African–American, as is Officer Nelson. Mrs. Kenny is white.

When Officer Nelson finished questioning Adams, she told Principal Hurley that Mrs. Adams–Travers wanted Mrs. Kenny arrested and charged with assault and battery and use of excessive force and that after she had completed conducting interviews of Pittman and Mrs. Kenny, they both might be arrested and charged. Principal Hurley sought out Mrs. Kenny and told her that Mrs. Adams–Travers was going to have her arrested for touching her daughter. Mrs. Kenny became distraught and asked for permission to call her husband. Mr. Kenny promised to meet his wife at the police station.

Mrs. Kenny returned to the school office and waited in a glassed-in room while Officer Nelson finished interviewing Pittman. After telling Mrs. Kenny that Adams's mother wanted her arrested for touching her child, Officer Nelson started to question her. Mrs. Kenny described the events to Officer Nelson, emphasizing that Adams had hit her and that

Mrs. Thomas had come into the classroom and had broken up the fight by physically removing Adams. Officer Nelson commented that she knew Mrs. Thomas. Officer Nelson did not interview Mrs. Thomas, however.

In Officer Nelson's report, she states that, upon being told that Adams was claiming that she had grabbed and bruised her arm, Mrs. Kenny said: "I don't remember—I couldn't have—, I did not injure or grab the student." When the interview was over, Officer Nelson informed Mrs. Kenny that she was being charged with common law assault and battery on a minor and that she would be taken to the police station in a few minutes. The police report recites the basis for this action as follows:

Based on [the above-quoted response by Mrs. Kenny] and recalling the department's domestic violence policy B–1 of bodily injury to the student and the fear of imminent bodily injury to the teacher from the parent and the substantial pain to the victim along with what happened with Commissioner Saunders on the previous night about racial inuendoes (sic), the teacher was then advised that she would be taken to the Cambridge Police Department pending further investigation. Mrs. Kenny was further advised that she may be charged with assault and battery and the use of excessive force.

Mrs. Kenny asked Officer Nelson for permission to return to her classroom to fetch her purse before being taken to the police station. Officer Nelson accompanied Mrs. Kenny to her classroom, standing by the door in full view of the students, and then escorted her down the hall, past another teacher and a school employee, and out the front door of the school. Officer Nelson placed Mrs. Kenny in the back seat of the police cruiser and drove to the police station. Mr. Kenny, the Mayor of Cambridge, and some other people were waiting outside in the parking lot. When Mrs. Kenny exited the cruiser, Officer Nelson handcuffed her, saying that it was "policy" to do so.

Officer Nelson walked Mrs. Kenny through the parking lot, into the police station, and to a snack room, where the

handcuffs were removed. Mr. Kenny joined his wife there. In response to a question posed by Mr. Kenny, Officer Nelson stated that Mrs. Kenny was being charged with common law assault on a minor and that, even if the minor's parent decided to drop the charge, it would remain on Mrs. Kenny's record forever. Mrs. Kenny became even more overwrought because she thought that she would not be able to teach if she had a criminal record.

Officer Nelson started to gather some preliminary information, such as Mrs. Kenny's driver's license number, stating as she did so that when Adams and Pittman were removed from the holding room, Mrs. Kenny would be placed there for fingerprinting and photographing; she then would go before a court commissioner who would set bail. After checking a few times to see if the students had been removed, Officer Nelson took Mrs. Kenny into the holding room. Mr. Kenny was directed to leave. About five minutes later, Officer Nelson was called out of the room and engaged in a conversation in the hallway. Mrs. Kenny was then removed from the holding room and was told by Lieutenant Steven McCollister that she was free to go back to the school because "everything had been dropped," and "if the parent wanted to press charges, she would have to file a complaint."

Officer Nelson maintains that she "was trying to do her best under trying circumstances." She arrived on the scene and began to interview Adams, who showed her a 3½ inch bruise on her arm and complained that Mrs. Kenny had caused the injury and that it still hurt. After Mrs. Adams–Travers insisted that if Mrs. Kenny were not charged with assault and battery, everyone would be sued, Officer Nelson told Principal Hurley that she might have to charge and arrest Mrs. Kenny and Pittman. Principal Hurley told her that was "okay," even though she had been called only to arrest Adams. She did not tell Mrs. Kenny that she was under arrest before they left the school; rather, she told her that "she would be taken to the Cambridge Police Department pending further investigation and that she may be charged with assault and battery and use of excessive force."

Officer Nelson takes the position that she arrested Mrs. Kenny only because Mrs. Adams–Travers insisted that she do so, not out of ill-will or spite, that she was kind and apologetic to Mrs. Kenny as she escorted her to the police station, that she handcuffed Mrs. Kenny merely to comply with departmental rules, and that she did not know Mrs. Kenny before the incident and had no reason to want to cause her harm and no intention of doing so.

### *Malice*

In *Clea v. City of Baltimore*, 312 Md. 662, 541 A.2d 1303 (1988), the Court observed:

> We recognize that 'disposition by summary judgment is generally inappropriate in cases involving motive or intent.' *DiGrazia v. County Exec. for Mont. Co.*, 288 Md. 437, 445, 418 A.2d 1191 (1980). We further recognize that even where the facts are undisputed, if those facts are susceptible of inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper. Those inferences, however, must be *reasonable* ones.

*Id.* at 677–78, 541 A.2d 1303 (additional citations omitted); *Barber v. Eastern Karting Co.*, 108 Md.App. 659, 672, 673 A.2d 744, *cert. denied, Woodbridge Karters v. Barber*, 343 Md. 334, 681 A.2d 69 (1996).

In the case *sub judice,* there are some slight variations in the first-level facts espoused by the Kennys and those acknowledged by Officer Nelson and the record is unclear about Officer Nelson's position about some of the facts on which the Kennys intend to submit proof. For example, it is not apparent whether Officer Nelson agrees that she knows Mrs. Thomas and that she indicated that to Mrs. Kenny. Assuming, however, that the material first-level facts are not in dispute,[1]

---

**1.** Officer Nelson has taken the general position that the facts are not in dispute and, from what we have seen in the record, she has not denied that she knows Mrs. Thomas and that she told Mrs. Kenny that.

if a reasonable inference of actual malice on Officer Nelson's part may be drawn from those facts, there remains a factual dispute that must be resolved by a jury. *Petetit,* 113 Md.App. at 417, 688 A.2d 54.

■ Our review of the record reveals several facts that, viewed together, could give rise to a reasonable inference of actual malice on Officer Nelson's part. Officer Nelson arrested Mrs. Kenny without a warrant for the common law crimes of assault and battery, which are misdemeanors. *Howard v. State,* 112 Md.App. 148, 159, 684 A.2d 491 (1996). Section 594B of Article 27 of the Maryland Code only authorizes a warrantless arrest for a misdemeanor when the crime has been committed in the presence of the arresting officer. Mrs. Kenny did not commit a misdemeanor in Officer Nelson's presence and there was no other ground, either statutory or constitutional, for a warrantless arrest. Nevertheless, Officer Nelson appeared to respond willingly to Mrs. Adams–Travers's demand that she arrest Mrs. Kenny. Moreover, she responded to the request even though it was put in overtly racial terms that indicated animus on Mrs. Adams–Traver's part. It would not be unreasonable for a fact-finder (which we are not) to interpret Officer Nelson's arguably eager compliance with Mrs. Adams–Traver's racially motivated request to mean that she shared in her hostility and was acting out of racial animus and hatred herself. Furthermore, Officer Nelson's failure to interview Mrs. Thomas, who was identified by Mrs. Kenny as the teacher who in fact touched Adams and who was known to Officer Nelson, could be interpreted by a fact-finder to substantiate that her actions toward Mrs. Kenny were motivated by racial bias and hostility. Finally, Officer Nelson's conduct in standing guard outside the classroom door as Mrs. Kenny retrieved her purse, escorting her to the police cruiser in front of her co-workers, handcuffing her in the parking lot before a group of spectators, and telling her that she would have a permanent criminal record when that was not the case could be construed by a fact-finder as calculated and designed to humiliate and embarrass her.

The essence of the dispute in this case is not what Office Nelson did but why she did it. Resolution of that issue will depend greatly on an assessment of credibility that is within the province of the fact-finder, in this case a jury. It would not be unreasonable for a jury to resolve the dispute over Officer Nelson's motivations and intentions by inferring from the facts that her conduct was inspired by racial hatred and by a desire to harm and humiliate Mrs. Kenny to satisfy that emotion. On the other hand, a jury could reasonably conclude that Officer Nelson was not motivated by ill will and acted without any intention to harm Mrs. Kenny. So long as a reasonable inference may be drawn one way or the other, however, there is a dispute of fact that takes the case to a jury. *See Bradley*, 113 Md.App. at 620, 688 A.2d 527 (dispute as to possible existence of malice on part of defendants asserting qualified immunity defense must be resolved by trier of fact).

Whether Officer Nelson acted "without malice" and is thus immune from liability is a central question that must be resolved by the jury as part of its overall deliberations. It is not a collateral issue. For that reason, the order denying Officer Nelson's motion for summary judgment is not final under the collateral order doctrine and we lack jurisdiction to review it.[2]

**APPEAL DISMISSED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**2.** Because this appeal does not meet the "collateralness" requirement of the collateral order doctrine, we do not address the question whether the qualified immunity at issue is not effectively reviewable on appeal from a final judgment.