725 A.2d 596

Carl GREEN

v.

Angelo BROOKS et al.

No. 689, Sept. Term, 1998.

Court of Special Appeals of Maryland.

March 2, 1999.

Milton Kaplan, Baltimore, for appellant.

Robert C. Verderaime, Verderaime & Dubois, P.A., Baltimore, Virginia W. Barnhart and Jeffrey Grant Cook, County Attorney, Towson, for appellee.

Argued before DAVIS, HOLLANDER and MARVIN SMITH (Ret., specially assigned), JJ.

HOLLANDER, Judge.

This appeal stems from a case of mistaken identity. On June 20, 1995, appellant, Carl Green, was arrested at his home by Baltimore City Police Officer Angelo Brooks, appellee, pursuant to a bench warrant issued for appellant by the District Court for Baltimore County. The bench warrant was issued after Green failed to appear for trial in connection with a shoplifting offense that occurred on March 9, 1995, at a supermarket in Baltimore County. At that time, Kenneth McKlary,[1] appellant's cousin, was apprehended in the store for shoplifting and claimed he was Carl Green. Although he had no identification, McKlary provided the police with Green's address.

Following appellant's arrest, Green was incarcerated for five days before it was discovered that he was not the man who committed the shoplifting offense. Subsequently, appellant instituted suit in the Circuit Court for Baltimore City against two of the officers involved in his arrest.[2] In his amended complaint, appellant sued Officer Brooks and Baltimore Coun-

---

1. The name is also spelled as "McClary" in the transcript and briefs.

2. In appellant's original complaint, filed on November 21, 1996, he sued the Baltimore City Police Department, the Mayor and City Council of Baltimore City, the Baltimore County Police Department, and the

ty Police Officer Timothy Murphy, appellee, who responded to the supermarket and arrested McKlary under the name "Carl Green." [3]

Counts I, III, and V of the amended complaint alleged false arrest, false imprisonment, and malicious prosecution on the part of Brooks and other unnamed officers. Counts II, IV, and VI alleged the same intentional torts against Murphy. Each count sought $200,000.00 damages. On August 11, 1997, the circuit court (Rombro, J.) signed an order granting Brooks's Motion to Dismiss Or, in the Alternative, Motion for Summary Judgment. On September 9, 1997, appellant filed a motion to revise the judgment. Thereafter, on December 9, 1997, Murphy filed a motion for summary judgment. After a hearing held on February 6, 1998, the circuit court (Byrnes, John Carroll, J.) granted Murphy's motion for summary judgment, and denied appellant's motion to revise the previous judgment entered in favor of Brooks. Appellant timely noted his appeal and presents two issues for our review, which we have condensed:

> Did the court err in granting appellees' motions to dismiss or for summary judgment?

We answer in the negative and shall affirm.

---

Baltimore County Executive. On April 9, 1997, the Circuit Court (Mitchell, J.) issued a series of four orders dismissing the complaint as to each defendant. One of the orders, granting the Baltimore County Executive's motion to dismiss, allowed appellant "leave to amend within 15 days to correctly identify the party Defendant." On May 5, 1997, appellant filed a motion to alter or amend, claiming that "through a consequence of irregularity or mistake in the Clerk's office" he had not received the orders until May 1, 1997. As a result, he asked the court for "sufficient time to amend his Complaint in accordance with the Court's apparent intention." On May 7, 1997, the court granted appellant's motion to alter or amend, allowing him until May 28, 1997, to amend his complaint. Appellant filed his amended complaint on that date.

3. Appellant also sued the unnamed officers who accompanied Brooks. The "other" officers were never served with process and are not a part of the case. Although not pertinent to the issues on appeal, we note that Officer Murphy filed a third-party complaint against Kenneth McKlary on August 21, 1997. The record does not reflect whether McKlary was ever served, however.

## Factual Summary

At 3:00 p.m. on the afternoon of March 9, 1995, an employee of a Mars Supermarket, located at the corner of York and Ridgley Roads in Baltimore County, observed a man attempting to steal ten bottles of Lubriderm lotion and a bottle of Advil by hiding the items in his coat. The items were valued at $67.00. The Mars employee apprehended the suspect and contacted the County police. Although the suspect had no identification, he told the store employee that his name was Carl Green and that he lived at 1705 Lorman Street in Baltimore City. That is appellant's address.

At 3:32 p.m., Officer Murphy responded to the scene. Based on the information obtained at the scene, Murphy placed appellant under arrest and charged him with petty theft. He listed the man's name in the "Application for Statement of Charges" as "Carl Green (NMN)." [4] In the narrative section of the Crime Report, Officer Murphy wrote that "Carl Green could produce no I.D. and was taken back to PC7 for processing." At 5:00 p.m. on March 9, "Green" was booked.[5] A notation on the Baltimore County Police Department's "Arrest Report" indicates that the suspect was subsequently "[r]eleased to Det Vaught Balto City—Fugitive." Bail was set at $5,000.00. The record does not otherwise disclose the circumstances under which McKlary, posing as Green, was released from jail.

A Mars Supermarket "Shoplifting Apprehension Report" described the shoplifter as a 6'2" black man weighing 160 pounds, with black hair and brown eyes. The form listed the suspect's date of birth as "11–26–67." An "Incident Report" completed by employees of the Mars Supermarket described

---

4. We assume "NMN" is an acronym for "no middle name."

5. In his brief, Officer Murphy asserts that, in addition to asking for the suspect's personal information, he "pulled the rap sheet for Carl Green and began asking questions of the suspect to see if he was who he said he was. The suspect knew all there was to know about Carl Green's criminal history...." Murphy does not cite to the record for this contention, however, and we have not found anything to substantiate it.

the thief as having a "thin" build.[6] In the Crime Report, Murphy described the suspect as a black man, 6'2" tall, 160 pounds. In addition, he said the suspect had a "dark" complexion and short black hair. According to appellant's complaint, he "is a dark skinned African–American man, approximately 6'2", 165 lbs." But, contrary to the descriptions given by the Mars employee and Officer Murphy, Green alleged in the Amended Complaint that McKlary is a "light-skinned African–American man, approximately 5'9", 140 lbs." [7]

Using the name "Carl Green," the suspect was scheduled to be tried for misdemeanor theft on May 15, 1995. McKlary did not appear for trial, however. Not surprisingly, the real Carl Green did not appear for trial either. Presumably, Green had no idea that his cousin had given the police Green's name at the time of his arrest. As a result of the failure to appear, on May 15, 1995, the District Court for Baltimore County (Boone, J.), issued a bench warrant for Green. The warrant ordered "any peace officer" to "arrest the above-named defendant who is to answer unto the State of Maryland concerning certain contempt committed by him by: Failing to appear in [the District] Court on 05/15/95 for hearing or trial after being notified to do so." It also identified Green's address as 1705 Lorman Street, Baltimore, Md, 21217, and described him as having the following characteristics: "Race: 1 Sex: M Ht. 6 02 St: 160 Hair: BLK DOB: 11/26/67".

On June 20, 1995, Officer Brooks, together with other unnamed police officers, arrested appellant, the real Carl Green, at his home on Lorman Street. At his deposition, appellant said that "between five and six" police officers participated in the arrest, which he described as follows:

> Best as I can recall, I heard a knock—we locks [sic] our screen door. You have the door, then you have the screen

---

6. The "Incident Report" differs from the "Shoplifting Apprehension Report" in that the man's date of birth is listed as "11/2/67," as opposed to "11/26/67."

7. We note that appellant never furnished the court below with an affidavit or other documentation as to McKlary's physical appearance.

door. And to knock on the door, he used his flashlight by the way he knocked. So I got up, put on my shorts and a baseball shirt, went to the door, opened the door and wind [sic] the window open, so I was like, "Yes, can I help you?" He was like, "Yo, Carl Green live here?" I said, "I'm Carl Green."

So he said, "Can you open the door?" So I opened the screen door, and he came in, and he was like, "I have a warrant for your arrest," so I was like, "For What?" And he was like, "For failure to appear in court."

\* \* \*

So I'm like, "Failure to appear in court?" You know, I said, "I ain't got no letters telling me to come to court."

\* \* \*

And they was like, "We have you for a failure to appear in court." And I was like, "What's the charge?" And he said, "For shoplifting at Owings Mills." I was like, "Owings Mills? I never been to Owings Mills."

\* \* \*

So I'm trying to say, "Well, do you all have a picture of this Carl Green?" because now I'm telling him that, you know, "You have the wrong guy, you know, I never been in Owings Mills." You know, they was like no, no. Based on this piece—the subjects—they was going on subjects that they had.

\* \* \*

So I'm telling them, you know, "You all have the wrong Carl Green."

\* \* \*

You know, at that time, they had cuffed me, so my little niece had to put my socks and my shoes on. As they was taking me out, you know, my moms is telling me, "Don't

worry about it." As we're going out, the officer that had me handcuffed, I'm asking him, you know, "When we get down to the police station, can you please contact the county and tell them to send you a picture of this Carl Green because you all have the wrong Carl Green."

Unfortunately, Green was mistakenly incarcerated for five days. According to appellant's complaint, the police subsequently learned that McKlary was the one who failed to appear for the theft charge and who had told the police, at the time of his arrest, that he was Green.[8] The docket of the Baltimore District Court indicates that on November 20, 1995, the charge against Carl Green was "disposed."

On July 17, 1997, Officer Brooks filed a Motion to Dismiss Or, in the Alternative, Motion for Summary Judgment. A certificate of service affixed to the motion claimed that it was mailed to appellant's counsel on July 16, 1997. Although an answer to the motion was due on August 4, 1997, appellant failed to respond to Brooks's motion. Thereafter, on August 11, 1997, the circuit court signed an order granting Brooks's motion.[9] The order provided:

### ORDER OF COURT

The motion to dismiss or, alternatively, the motion for summary judgment heretofore filed by Off. Angelo Brooks, on the defendants, having been read and considered, and the Court also having considered the memorandum of law in support of the motions and exhibits which were attached as part of plaintiff's amended complaint and attached as part of defendant Brook's [sic] memorandum of law, and the Court

---

8. The record does not make clear how it was discovered that Green was not the right man. At the motions hearing on February 6, 1998, Murphy's counsel told the court that when Officer Murphy was "contacted in the courtroom by Mr. Kaplan [counsel for Carl Green], Murphy helped release the man saying that's not the guy I arrested, I arrested Kenneth McClary."

9. We have been unable to locate the order in the court file. A copy was provided in the appendix to Officer Murphy's brief, however.

having considered plaintiff's opposition thereto,[10] it is this 11 th day of August, 1997,

ORDERED, that the motion to dismiss filed by defendant Off. Angelo Brooks BE and the same hereby IS GRANT-ED; and, it is further,

ORDERED, that the motion for summary judgment here-tofore filed by defendant Off. Angelo Brooks BE and the same hereby IS GRANTED; and it is further,

ORDERED, that judgment be entered in favor of defen-dant Off. Angelo Brooks against plaintiff for costs.

(Strike-outs in original).

The docket contains two entries relating to the order. The first, dated August 13, 1997, says: "FILE RETURNED FROM J. ROMBRO, ORDER SIGNED AND DELIVERED TO ORDER'S [sic] CLERK." The docket indicates, however, that the order was not filed until September 8, 1997. An entry on that date provides: "ORDER OF COURT DATED 8–11–97, THAT THE MOTION TO DISMISS FILED BY DEFT (ANGELO BROOKS) IS HEREBY "GRANTED" & MOTION FOR SUMMARY JUDGMENT IF [sic] HEREBY "GRANTED" FD. (J. ROMBRO) FD." (19B).

On September 9, 1997, appellant filed a Motion to Revise Judgment. He asserted, *inter alia*, that "through inadver-tence, Plaintiff's counsel was unaware of Defendant Brooks' Motion to Dismiss and Defendant Brook's [sic] Motion for Summary Judgment, and as such, failed to respond to Defen-dant Brooks' motion in a timely manner." He asked the court, in the interest of justice, to reverse its order granting Brooks's motions. Meanwhile, on July 22, 1997, Officer Mur-phy answered appellant's complaint. Murphy later moved for summary judgment.

At the motions hearing on February 6, 1998, the court noted that the officers "did take reasonable steps" to resolve the situation. He queried whether uncovering the falsity of

10. A review of the court's docket reveals that, in fact, Green had filed no opposition to Brooks's motion.

McKlary's statement would have "require[d] an effort, an energy level that the law doesn't demand?" Appellant suggested that the police department should have made an "arrest packet" available to the arresting officers, so that they would have a photograph at their disposal to verify appellant's identity. The court commented that appellant's suggestion was a good one but, in the court's view, appellant's complaint about the lack of an arrest packet "[gave appellant] a credible complaint to the Baltimore City Police Department, and to this Officer, but it [did not] give [appellant] a cause of action, given that you are dealing with public officers."

The court also indicated that appellees were entitled to immunity because Green had failed to show malice. The court said:

> You don't have constitutional malice in these cases. I don't think you could ever find it unless you had some personal vendetta or something going on. You don't have that in this case. I really think your cause of action is against the evil doer here. The name stealing. Holding up in false light.

The court concluded:

> [T]here are no disputed facts that are material to the law here. That is the difficulty. There may be some disputed facts, probably dozens of them. But they don't—they are not material in the sense that they won't if resolved in your favor lead to a favorable result for you [appellant] in the end. That's the bottom line.

Accordingly, the court denied appellant's Motion to Revise Judgment, and granted Officer Murphy's motion for summary judgment. On March 3, 1998, appellant filed his appeal "from the orders entered in this action on February 6, 1998 by Judge John Carroll Byrnes."

We shall include additional facts in our discussion of the issues.

## Discussion

### I.

Preliminarily, we must address several procedural matters that the parties have not explored, involving the

status of the appeal as it relates to Brooks. With respect to Brooks, appellant expressly noted an appeal only from Judge Byrnes's order of February 6, 1998, which denied his motion to revise Judge Rombro's order of August 11, 1997; that order had granted Brooks's motions to dismiss and for summary judgment. The question, then, is whether appellant is entitled to challenge the underlying order of August 11, 1997. This issue is important, because "[a]n appeal from the denial of a motion asking the court to exercise its revisory power is not necessarily the same as an appeal from the judgment itself. Rather, the standard of review is whether the trial court abused its discretion in declining to revise the judgment." *Blitz v. Beth Isaac Adas Israel Congregation,* 115 Md.App. 460, 469 n. 4, 694 A.2d 107, *rev'd on other grounds,* 352 Md. 31, 720 A.2d 912 (1998). We conclude that appellant's appeal includes the underlying order of August 11, 1997. We explain.

█ A lengthy delay ensued between the date Judge Rombro signed his order on August 11, 1997, and the date that his order was docketed; it was not docketed until September 8, 1997. Thus, when appellant filed his revisory motion on September 9, 1997, it was, by good fortune for him, filed within ten days of September 8, 1997.

█ To be sure, we have no reason to believe that the delay in docketing corresponded with a delay in notice to appellant about the order of August 11, 1997. To the contrary, it seems clear that appellant received a copy of the order of August 11, 1997, well before it was docketed. Indeed, if the clerk's office had first mailed a copy of the August order on September 8, 1997, when it was docketed, the filing of the revisory motion the next day, September 9, 1997, would have been remarkably fast. Nevertheless, the ten-day period in which to file a post-trial motion is triggered by the day the judgment was "entered" on the court's docket, not the day the trial judge actually signed the order. *See Estep v. Georgetown Leather Design,* 320 Md. 277, 287, 577 A.2d 78 (1990)(stating that "a final judgment disposing of all claims or parties was not in existence until the judgment ... was entered on the dock-

et. . . ."); *Warehime v. Dell,* 124 Md.App. 31, 40–41, 720 A.2d 1196 (1998).

 Although appellant's timely notice of appeal referred only to the court's order of February 6, 1998, and not the August 11, 1997 order, we are satisfied that we are not precluded from reviewing the underlying order. Because appellant's motion to revise was filed within the ten-day tolling period, the revisory motion stayed the appeal period until resolution of the motion to revise. *See Unnamed Attorney v. Attorney Grievance Comm'n,* 303 Md. 473, 494 A.2d 940 (1985)(holding that motion filed under Md. Rule 2–535 within 10 days of judgment is treated as a motion to alter or amend under Md. Rule 2–534, thereby staying the appeal period). Moreover, that appellant's notice of appeal mentioned only the court's order of February 6, 1998, which denied the motion to revise, does not bar us from considering the order of August 1997. It is clear that the language used in appellant's notice of appeal does not determine what we may review. *See B & K Rentals and Sales Co. v. Universal Leaf Tobacco Co.,* 319 Md. 127, 133–38, 571 A.2d 1213 (1990); *Institutional Management Corp. v. Cutler Computer Concepts, Inc.,* 294 Md. 626, 632–33, 451 A.2d 1224 (1982); *cf. In Re Levon A.,* 124 Md.App. 103, 125–26, 720 A.2d 1232 (1998). What the Court said in *B & K Rentals,* 319 Md. at 133–34, 571 A.2d 1213, is pertinent here:

> Maryland cases usually have construed notices of appeal liberally and have ignored limiting language in notices of appeal, deeming it surplusage. The cases have taken the position that the purposes of a notice or order of appeal is not to designate or limit the issues on appeal. Instead, the designation of issues on appeal is a function of the information report required by Rule 8–205, the prehearing conference under Rule 8–206(b), and the briefs.

Therefore, notwithstanding the language in appellant's notice of appeal, we shall consider it as an appeal from the underlying judgment.

Our decision to reach the underlying judgment as it relates to Brooks raises yet another question: In the underlying

order of August 11, 1997, did the court grant Brooks's motion to dismiss or his motion for summary judgment? In literal terms, Judge Rombro's order expressly granted both. We shall, however, treat the court's order as to Brooks as a grant of summary judgment. Again, we explain.

■ Maryland Rule 2–322(c) provides that "[i]f, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of .as provided in Rule 2–501...." *See Williams v. Prince George's Cnty.,* 112 Md.App. 526, 537–39, 685 A.2d 884 (1996)(holding that when the lower court "had before it facts that went beyond the pleadings," the appellate court would treat the lower court's grant of a motion to dismiss, or in the alternative a motion for summary judgment, as a motion for summary judgment); *Hrehorovich v. Harbor Hospital Ctr., Inc.,* 93 Md.App. 772, 782, 614 A.2d 1021, *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993). In his Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, Brooks appended the exhibits that had been attached to Green's amended complaint. In Murphy's summary judgment motion and Green's response to Murphy's summary judgment motion, the parties attached exhibits containing information obtained during discovery, including the "Shoplifting Apprehension Report," the Baltimore County "Crime/Incident Report," and "Application for Statement of Charges," and excerpts from Green's deposition.

It is also clear that when Judge Byrnes reconsidered Judge Rombro's order, he looked at it anew, in light of all the documents and testimony that had been generated during discovery. The motions hearing of February 6, 1998, was replete with references to matters outside the pleadings, including statements taken from appellant's deposition. Moreover, comments made by appellant's counsel during the motions hearing indicate that, in his view, the hearing was meant to decide whether summary judgment was appropriate.

Appellant's counsel said: "I want to just bring out the point, at this level we have to discuss whether there are disputed facts or not, not on the issue of the law, but on summary judgment." We also note that appellant's counsel has not complained, either before the trial court or on appeal, that it was improper to consider the matter as a motion for summary judgment.

Therefore, based on Rule 2–322(c), we conclude that, on review, summary judgment analysis is appropriate as to the motions of both appellees. Maryland Rule 2–501 establishes a two part test for determining when summary judgment is warranted. In order to grant summary judgment, the trial court must determine that no genuine dispute exists as to any material fact, and that one party is entitled to judgment as a matter of law. *See Bagwell v. Peninsula Regional Medical Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). A material fact is one that will "alter the outcome of the case depending upon how the factfinder resolves the dispute over it." *Id.* at 489, 665 A.2d 297; *see also King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). In this regard, all factual disputes are resolved in favor of the non-moving party. Moreover, "even where the facts are undisputed, if those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper. Those inferences, however, must be *reasonable* ones." *Clea v. Mayor and City Council of Baltimore*, 312 Md. 662, 677, 541 A.2d 1303 (1988) (internal citations omitted); see *Di Grazia v. County Exec. for Mont. Co.*, 288 Md. 437, 445, 418 A.2d 1191 (1980). All reasonable inferences drawn from the facts must be resolved in favor of the non-moving party. *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 387, 693 A.2d 370 (1997); *see also Berkey v. Delia*, 287 Md. 302, 304–05, 413 A.2d 170 (1980).

## II.

Appellant argues that two genuine issues of material fact precluded summary judgment. First, he contends that a

material factual dispute existed as to whether the officers acted with "due diligence" in making the arrests. Second, appellant asserts that a jury should have been allowed to decide whether the officers' behavior demonstrated "actual malice," thereby "waiving" the qualified immunity bestowed on them as officials of a municipal corporation under Md.Code (1974, 1995 Repl.Vol.) § 5–321(b)(1) of the Courts and Judicial Proceedings Article ("C.J.").

In our view, the conduct of the officers was not actionable for false arrest, false imprisonment, or malicious prosecution. To be sure, it is most unfortunate that Green was incarcerated for an offense committed by another. Nevertheless, after evaluating the undisputed facts with respect to the conduct of the appellees, we conclude that they acted based upon probable cause and with legal justification. Consequently, neither is liable for the intentional torts alleged by appellant.

## A. The Elements of the Torts

We begin our analysis by briefly examining the elements of the intentional torts that Green contends the officers committed.

 In order to prevail on a claim for false arrest, "the plaintiff must prove that the defendant deprived him or her of his or her liberty without consent and without legal justification." *Scott v. Jenkins,* 345 Md. 21, 29, 690 A.2d 1000 (1997). *See also Ashton v. Brown,* 339 Md. 70, 119, 660 A.2d 447 (1995); *Montgomery Ward v. Wilson,* 339 Md. 701, 721, 664 A.2d 916 (1995); *Fine v. Kolodny,* 263 Md. 647, 651, 284 A.2d 409 (1971), *cert. denied,* 406 U.S. 928, 92 S.Ct. 1803, 32 L.Ed.2d 129 (1972); *Fleisher v. Ensminger,* 140 Md. 604, 620, 118 A. 153 (1922); *Lewin v. Uzuber,* 65 Md. 341, 348–49, 4 A. 285 (1886); *Mitchell v. Lemon,* 34 Md. 176, 180 (1871). "The elements of false imprisonment are the same as the elements for false arrest." *Davis v. DiPino,* 121 Md.App. 28, 38, 708 A.2d 357, *cert. granted,* 350 Md. 488, 713 A.2d 980 (1998). "Legal justification" was defined by the Court of Appeals in

*Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 261 A.2d 731 (1970). The Court explained:

> When the cases speak of legal justification we read this as equivalent to legal authority.... Whatever technical distinction there may be between an "arrest" and a "detention" the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest.

*Id.* at 655, 261 A.2d 731 (internal citations omitted).

With regard to an arrest by a police officer, the officer's liability "will ordinarily depend upon whether or not the officer acted within his legal authority to arrest." *Montgomery Ward,* 339 Md. at 721, 664 A.2d 916. Consequently, "[a]n arrest made under a warrant which appears on its face to be legal is legally justified in Maryland, even if unbeknownst to the arresting police officer, the warrant is in fact improper." *Ashton,* 339 Md. at 120, 660 A.2d 447.

The elements of malicious prosecution are: "(1) a prosecution initiated against the plaintiff without probable cause, (2) with malice, or with a motive other than to bring the offender to justice; and (3) termination of the prosecution in favor of the plaintiff." *Davis v. DiPino, supra,* 121 Md.App. at 82–83, 708 A.2d 357; see also *Wilson, supra,* 339 Md. at 714, 664 A.2d 916; *Brewer v. Mele,* 267 Md. 437, 440, 298 A.2d 156 (1972); *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146 (1978); *Laws v. Thompson,* 78 Md.App. 665, 681, 554 A.2d 1264, *cert. denied,* 316 Md. 428, 559 A.2d 791 (1989); *Cottman v. Cottman,* 56 Md.App. 413, 420, 468 A.2d 131 (1983). "Probable cause means 'facts and circumstances "sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." ' " *Davis v. DiPino, supra,* 121 Md.App. at 50, 708 A.2d 357 (citations omitted). A finding of probable cause should be " 'based on the factual and practical considerations of everyday life on which reasonable people act and is assessed by considering the totality of the circumstances.' " *Id.* at 51, 708 A.2d 357 (quoting *Howard v. State,* 112 Md.App. 148, 160–61,

684 A.2d 491 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997)); *see Braxton v. State,* 123 Md.App. 599, 620–21, 720 A.2d 27 (1998). As the Court explained in *Exxon Corp. v. Kelly:*

> "Probable cause is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious [person] in believing that the accused is guilty." ... It is equally clear that if the facts, and the inferences to be drawn therefrom, relied on to constitute probable cause are clear and undisputed, the question is one of law for the court; where the facts are contested, however, whether they are proved is a question for the jury.

*Id.* at 697–98, 381 A.2d 1146 (citations omitted). *See also Brewer,* 267 Md. at 447, 298 A.2d 156 (stating that "it is settled that where there is no genuine dispute as to the material facts, the question whether those facts do or do not mount up to probable cause is one of law for the court.").

In *Ashton v. Brown, supra,* 339 Md. 70, 660 A.2d 447, the Court explored the relationship between "probable cause" and "legal justification", stating:

> [W]hile the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest.

*Id.* at 120, 660 A.2d 447. *See, e.g., Dorsey v. Winters,* 143 Md. 399, 122 A. 257 (1923)(granting a new trial in part because the court employed a probable cause standard rather than a legal justification standard in its instruction on false imprisonment). The *Ashton* Court noted, for example, that "probable cause is *not* a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense, or upon an arrest by a private person." *Id.* at

121, 660 A.2d 447. (Emphasis added). Although probable cause may be "considered for the purpose of mitigation of damages," *Clark's Brooklyn Park, Inc. v. Hranicka,* 246 Md. 178, 186, 227 A.2d 726 (1967), legal justification is the pertinent inquiry when considering the merits of a false imprisonment claim. *Ashton,* 339 Md. at 121, 660 A.2d 447. *See also Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173–74, 122 A.2d 457 (1956); *Laws v. Thompson,* 78 Md.App. 665, 686, 554 A.2d 1264, *cert. denied,* 316 Md. 428, 559 A.2d 791 (1989).

## 1. Officer Murphy's Conduct

Officer Murphy had no contact with Green. Rather, his conduct involved McKlary. Murphy arrested McKlary, at the scene, without a warrant. At the time, McKlary identified himself as "Carl Green." The legal authority for a warrantless arrest has been codified in Md.Code (1957, 1996 Repl. Vol.), Art. 27 § 594B. Section 594B(e), in particular, governs the authority of an officer to make a warrantless arrest for a misdemeanor, such as petty theft, occurring outside the officer's presence. That section provides:

*Additional circumstances for warrantless arrest.*—A police officer may arrest a person without a warrant if the officer has probable cause to believe:

(1) That an offense listed in subsection (f) of this section has been committed;

(2) That the person has committed the offense; and

(3) That unless the person is immediately arrested:

(i) The person may not be apprehended;

(ii) The person may cause injury to the person or damage to the property of one or more other persons; or

(iii) The person may tamper with, dispose of, or destroy evidence.

*See Howard v. State, supra,* 112 Md.App. 148, 684 A.2d 491 (1996).

Appellant has not pointed to any disputed fact or inference that would undermine the conclusion that Officer Murphy's arrest of McKlary was justified under Art. 27,

§ 594B. When Officer Murphy arrived at the scene, he found McKlary in the custody of a witness who told Murphy that he saw McKlary place store merchandise in his coat. The crime the witness described was misdemeanor theft, in violation of Art. 27, § 342. That is a crime enumerated in Art. 27, § 594B(f). Murphy had no reason to doubt that the man in custody was the person who committed the offense. Because the suspect had no identification, Murphy also had probable cause to believe that, unless "Green" was arrested at the scene of the crime, he might not be readily apprehended later. Moreover, Murphy had no reason to believe that the information McKlary gave about his own identity and address was false.

Murphy then transported the suspect back to the precinct. There, according to Murphy's brief, he pulled Green's "rap sheet" and queried McKlary about his alter-ego's criminal history.[11] In light of these undisputed facts, Officer Murphy was "legally justified," pursuant to Art. 27, § 549B(e), in acting as he did.

 Alternatively, we note that Murphy did not execute the arrest warrant that deprived Green of his liberty. That is the arrest at issue here; the arrest of McKlary at the scene is not challenged. Therefore, as a matter of law, appellant failed to establish that Murphy "deprived him . . . of his . . . liberty," *Scott*, 345 Md. at 29, 690 A.2d 1000, the first element of the tort of false imprisonment and false arrest.

In *Montgomery Ward v. Wilson*, the Court of Appeals explained that

> while a third party who wrongfully instigates another's *warrantless* arrest may be liable for false imprisonment, the false imprisonment tort does not lie against either the instigator or the arresting officer where the plaintiff is not

---

11. We presume the officer obtained information as to Green's physical description from a review of police records. Although Murphy made first-hand observations of McKlary at the time of the occurrence, the description in the police report matched the description of the real Carl Green.

detained by the instigator and is arrested by a police officer pursuant to a facially valid warrant. Rather, to the extent that the instigator acts maliciously to secure the warrant for the plaintiff's arrest, the plaintiff's cause of action against the instigator is malicious prosecution.

*Id.*, 339 Md. at 723, 664 A.2d 916. (emphasis in original).

*Davis v. DiPino,* 121 Md.App. 28, 708 A.2d 357, illustrates that the rule articulated in *Wilson* applies with equal force when the original instigator is a police officer. In *DiPino,* an undercover officer filed an Application for Statement of Charges against Davis, alleging that he hindered the officer and her partner in the performance of their duties. *Id.* at 365–66, 708 A.2d 357. According to the police officer, Davis allegedly "blew" the officers' "cover" on a public street. As a result, Davis was subsequently arrested and incarcerated for several days; the charges were later dismissed by the State. Thereafter, Davis instituted a civil action against the officers alleging, among other things, false imprisonment, false arrest, and malicious prosecution. We affirmed summary judgment on the false arrest count as to the officer who filed the Statement of Charges, because she was not the officer who actually apprehended the plaintiff. We said: "While [the officer who filed charges] may have set in motion the process by which [the detainee] was deprived of his liberty, the common law tort of false arrest contemplates that the defendant, through threats or actions, must create a 'present restraint of liberty.'" *Id.* at 82, 708 A.2d 357. (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 11, at 51 (5 th ed.1984)).

Murphy's conduct also is not actionable as malicious prosecution, because he acted with probable cause. For the reasons outlined above, the "considerations of everyday life," even in the context of law enforcement, suggest that a reasonable person would have suspected that the person in custody committed the crime, and that the suspect was who he claimed to be.

Furthermore, there is no evidence that Murphy acted with malice, or "a motive other than to bring the offender to justice." *Davis v. DiPino, supra,* 121 Md.App. at 82, 708 A.2d 357. Murphy had never met Green. The record before the court contained no evidence that Murphy intended anything other than a lawful arrest of a person suspected of petty theft. Even if, *arguendo,* Murphy could have taken additional steps to verify the identity of the suspect, the Court of Appeals has made clear that "[m]ere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element" of malicious prosecution. *Montgomery Ward v. Wilson, supra* 339 Md. at 719, 664 A.2d 916.

To be sure, McKlary's deceit set off a chain of events that culminated in appellant's detention. But, as the Court said in *Brewer,* 267 Md. 437, 298 A.2d 156, the law strikes a necessary balance between the protection of innocent citizens and discretion to law enforcement officers to arrest suspects based on "probable" and not "certain" cause. The Court said:

> It is the realistic judgment of state and national constitutions as well as that of the common law that personal liberties must sometimes yield to the needs of public order upon the basis of probabilities which are less than certainties. The balance, painstaking arrived at, is adjusted to reduce significantly the incidence of mistake, but it does not presume to eliminate it. That a decision based upon probable cause should upon occasion yield an improbable consequence is of the very nature of such reliance upon probability. Inherent in the process is the sometimes bad arrest of the guilty and the sometime good arrest of the innocent.

*Brewer,* 267 Md. at 438–39, 298 A.2d 156.

The evidence presented to the court would not have permitted a jury to find that appellant was liable under any of the theories alleged in appellant's complaint.

## 2. Officer Brooks

Unlike Officer Murphy, Officer Brooks arrested appellant pursuant to a warrant. With regard to false imprison-

ment and false arrest, we again note that "[a]n arrest made under a warrant which appears on its face to be legal is legally justified in Maryland, even if, unbeknownst to the arresting police officer, the warrant is in fact improper." *Ashton,* 339 Md. at 120, 660 A.2d 447.[12]

Appellant acknowledges that rule, but contends that Officer Brooks cannot "hide behind a warrant when there is reason for further investigation into the situation." In his view, the jury should have been allowed to decide that, despite the warrant, Brooks should have employed a greater degree of "due diligence in arresting the correct person...."

▪ At the outset, we note that the warrant satisfied the criteria of a "valid warrant" found in the Restatement (Second) of Torts (1965). Section 123 of the Restatement provides:

What Constitutes Valid Warrant

A warrant is valid if

 (a) it is regular in form, and

 (b) it is issued by a court, body, or official

 (i) having authority to issue the warrant for the conduct for which it is issued and which is described therein, and

 (ii) having jurisdiction over the person sufficiently named or otherwise described therein, and

 (c) all proceedings required for the proper issuance of such a warrant have duly taken place.

Comment (a) to § 123 adds that "[a] warrant is valid even though the court, *through lack of information or otherwise,*

---

**12.** The rule stated in *Ashton* with regard to the legal sufficiency of a facially valid warrant in the context of false arrest or imprisonment does not undermine the general proposition, rooted in the Fourth Amendment of the United States Constitution and Article 26 of the Maryland Constitution, that a valid warrant must "set forth facts constituting probable cause for the crime in issue." *Davis v. DiPino,* 708 A.2d at 381–82. *See also Braxton v. State,* 123 Md.App. at 619–20, 720 A.2d 27; *Wiegmann v. State,* 118 Md.App. 317, 347, 702 A.2d 928 (1997), *aff'd,* 350 Md. 585, 714 A.2d 841 (1998).

has issued it for the arrest of a person in fact innocent of the offense alleged. The guilt or innocence of the accused is not a matter which concerns the [arresting] officer."

In support of his argument, appellant relies on a Fourth Circuit case, *Mensh v. Dyer*, 956 F.2d 36 (4th Cir.1991), to suggest that, in addition to a warrant with a physical description of the suspect, Officer Brooks and his colleagues should have used an "arrest packet" similar to the one used by the police in *Mensh*. In that case, police officers from Christiansburg, Virginia took several steps to avoid making a mistaken arrest that appellees in this case did not employ. The Virginia police officers carried an "arrest packet" to the scene that contained a picture of the person sought in the warrant. *Id.* at 38. The officers in *Mensh* showed the picture to the arrestee's wife, who was able to verify that the person the officers sought was her son, not her husband.

Appellant also refers us to *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). In that case, a Texas man, Leonard McCollan ("Leonard"), was arrested on narcotics charges. Upon his arrest, Leonard claimed to be his brother, Linnie McCollom. He signed documents in his brother's name, and offered police a false driver's license purporting to be Linnie's, with his own picture superimposed on the front. As a result of Leonard's deception, Linnie was later arrested on an outstanding warrant issued by the county that had been fooled by Leonard's previous falsehood. He was imprisoned for three days before the discrepancy was rectified. The Supreme Court held that the failure of the local police department to implement greater measures to prevent such an error did not offend the constitutional rights of the victim under the Fourteenth Amendment. *Id.* at 142, 99 S.Ct. 2689. The Court said, however, in *dicta*, that "under a tort-law analysis it may well have been [a wrongful arrest]." *Id.*

Neither *Baker* nor *Mensh* help appellant's cause; *Baker* simply did not address the question we face here. The court's *dicta* in *Mensh* says nothing about the adequacy of appellant's claim under Maryland law. Moreover, appellant's complaint is

grounded on claims of intentional tort, not negligence. The salient inquiry for us is whether Brooks acted with legal justification or probable cause in serving the warrant. Here, the warrant, on its face, displayed no hint to the arresting officers that it was deficient in any way. It accurately described the address and the physical characteristics of the person named, and it set forth the basis for the issuance of the warrant. Indeed, the information contained in the warrant was effective in leading the officers to the person named on the face of the warrant. The error on the Department's part stemmed from not realizing that McKlary had purloined Green's identity.

The only evidence apparent to the officers serving the warrant that Green was not the man who was arrested in Baltimore County was Green's own protest that he was innocent. But, as any experienced law enforcement officer can attest, "[i]t is certainly not uncommon for the subjects of arrest warrants to object, even vociferously, when they are apprehended." *White v. Olig,* 56 F.3d 817, 820 (7th Cir.1995). While officers should do everything reasonably within their power to prevent mistakes in the identification of suspects, we cannot say that Brooks should have aborted the arrest based on Green's own protests. Nor did his failure to carry an "arrest packet" undermine probable cause to complete the arrest.

*Williams v. Prince George's County, supra,* 112 Md.App. 526, 685 A.2d 884, provides a useful comparison. In that case, Mary Williams's car was stolen from a supermarket parking lot and later recovered by police in an alley near the store. Seven weeks after the incident, Ms. Williams's son, Jesse, was driving the car with her permission when a police officer followed him into the parking lot of a McDonald's fast food restaurant. When Williams stepped out of the car, the police officer approached him with his service revolver drawn. The officer ordered him to get back into the vehicle and then called for back-up. When the other officers arrived, Williams was placed on the ground and handcuffed. Only after a dispatch operator called Ms. Williams did it become apparent that the

police department had failed to update its computer records after Ms. Williams's car had been recovered. *Id.* at 536–37, 685 A.2d 884. Nevertheless, this Court held that the arresting officer had legal authority to make the arrest. Writing for the Court, Judge Davis said:

Having probable cause to stop and arrest appellant, [the officer] had the legal authority and justification to detain [Williams], at least until it could be ascertained that he was not driving a stolen vehicle. [The officer] had never met appellant, believed he was driving a stolen car and, in the course of arresting a suspected car thief who may have had a weapon concealed in [his coat], acquitted himself appropriately under the circumstances. Thus, the record is void of facts which, if true, would establish assault, battery, false imprisonment, or false arrest.

*Id.* at 554–55, 685 A.2d 884. *Cf. State v. Hall,* 122 Md.App. 664, 669–70, 716 A.2d 335, *cert. denied,* 352 Md. 310, 721 A.2d 989 (1998)(holding that Department of Corrections was not liable for false imprisonment when it miscalculated inmate's "good time" credit because the Department was "acting within its legal authority.")

### B. Immunity

With regard to immunity, appellant contends that "it is for a jury to decide whether the *failure to act* in this situation ... equates to 'actual malice' thereby waiving the [officers'] qualified immunity protection." (Emphasis added). Appellant asserts that Murphy and Brooks "purposefully, intentionally and willfully ignored and refused [Green's] pleas for help" and "refused to utilize readily available and accessible information to ensure the arrest of the correct person."

The officers assert "qualified immunity" pursuant to C.J. § 5–321(b)(1). That section provides:

(b) *Nonliability of officials generally ...* —

(1) An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as

an official or individual from any civil liability for the performance of the action.

The immunity described in C.J. § 5–321(b)(1) is "qualified" because its benefits do not apply: 1) when the official acts in a non-discretionary capacity; 2) when the official acts outside his or her scope or authority, or 3) when the official acts with "malice." "Malice" in this context requires a showing that "the official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately injure the plaintiff.'" *Nelson v. Kenny,* 121 Md.App. 482, 487, 710 A.2d 345 (1998)(quoting *Davis v. DiPino,* 99 Md.App. at 290, 637 A.2d 475 (1994)); *see also Penhollow v. Board of Comm'rs for Cecil County,* 116 Md.App. 265, 294, 695 A.2d 1268 (1997); *Williams, supra,* 112 Md.App. at 550, 685 A.2d 884; *Manders v. Brown,* 101 Md.App. 191, 216, 643 A.2d 931, *cert. denied,* 336 Md. 592, 650 A.2d 238 (1994). Malice may be inferred from the surrounding circumstances. *Leese v. Baltimore County,* 64 Md.App. 442, 480, 497 A.2d 159, *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985)(holding that evidence of previous interpersonal conflict between a Baltimore County employee and his supervisors was sufficient to defeat a motion to dismiss). But, "the mere assertion that an act 'was done maliciously, or without just cause, or illegally, or with wanton disregard, or recklessly, or for improper motive' is not sufficient." *Manders,* 101 Md.App. at 216, 643 A.2d 931 (quoting *Elliott v. Kupferman,* 58 Md.App. 510, 528, 473 A.2d 960 (1984)). In order to defeat immunity, the plaintiff " 'must allege with some clarity and precision those facts which make the act malicious.'" *Id.* (quoting *Elliott* ).

Because we conclude that appellees' conduct is not actionable for the torts of false arrest, false imprisonment, or malicious prosecution, we need not reach the immunity issue. In this regard, we rely on the recent case of *Branch v. McGeeney,* 123 Md.App. 330, 718 A.2d 631 (1998).

In *Branch,* police officers handcuffed and detained a nine-year old girl on the mistaken belief that they were required by

Departmental policy to transport her to the police station for fingerprinting after the girl's neighbor had complained about the child's behavior in throwing acorns against the side of the complainant's apartment building. Believing that all juvenile suspects had to be fingerprinted, the officers prepared to drive the child to the police station. A restless crowd prevented the officers from actually transporting the girl, and she was subsequently released unharmed. The girl sued the officers, alleging a variety of constitutional and common law violations, including false arrest and false imprisonment. Summary judgment was entered on behalf of the defendants on all counts.

On appeal, the child contended that there were genuine issues of material fact that would have entitled a jury to find that the officers harbored sufficient "malice" to defeat the immunity bestowed by C.J. § 5–321(b)(1). On this issue, we affirmed. We held that, because the officers possessed probable cause to arrest the youngster, she could not sustain the underlying common law claims. Therefore, we said that the issue of malice was "moot." *Id.* at 351, 718 A.2d 631. *See also Brewer, supra,* 267 Md. at 443–44, 298 A.2d 156 (not reaching issue of immunity because police officers were entitled to judgment as a matter of law on underlying tort claims).

 Even if we were to reach the merits of the immunity issue, however, we would conclude that the court properly granted summary judgment. The same considerations that informed our earlier discussion of the underlying torts would compel us to conclude that appellant has not presented a genuine issue of material fact jeopardizing appellees' immunity defense under C.J. § 5–321(b)(1).

As we explained, there is no evidence that Officer Murphy's decision to charge the man he apprehended under the name "Carl Green" was motivated by ill-will toward the real Carl Green. Neither is there evidence that Officer Brooks harbored a nefarious motive in not believing appellant's assertion that he was not the man sought for the crime, particularly when the warrant provided an accurate description of Green

and identified his correct address. Moreover, unlike in *Leese,* there was no history of animosity between Green and the officers that might have led a jury to infer that, on this occasion, appellees intended to harm appellant personally.

Appellant refers us to *Town of Port Deposit v. Petetit,* 113 Md.App. 401, 688 A.2d 54, *cert. denied,* 346 Md. 27, 694 A.2d 950 (1997), as an example of a case in which the issue of malice was for the jury. There, the Chief of Police of the Town of Port Deposit, dressed in plain clothes and driving an unmarked car, observed a man speeding away from a local bar in a truck. The police chief pursued the fleeing vehicle. When the truck did not stop, the chief fired several shots at the truck's wheels. *Id.* Eventually, the "truck car came to a stop when the right tire blew out as he attempted to make a U-turn in order to get the attention of a passing state trooper." *Id.* at 406, 688 A.2d 54. The driver of the truck was thrown to the ground, handcuffed, and held at gunpoint by the police chief until a State trooper arrived. Subsequently, the driver of the truck sued the chief, as well as the Town of Port Deposit, alleging a host of constitutional and tort claims. The chief's motion for summary judgment was denied by the trial court because, in its view, "there are inferences to be drawn from the facts that are in the province of the trier of fact." *Id.* at 417, 688 A.2d 54. On appeal, this Court agreed. We held that "an inference can be drawn that [the chief] became so enraged at what appeared to him to be grossly reckless conduct by Petetit . . . that he fired at Petetit's vehicle with the intention of injuring Petetit." *Id.* at 418, 688 A.2d 54.

Unlike *Port Deposit,* however, the officers in this case did not affirmatively display conduct that could be interpreted as personal aggression. Appellant alleges only that the officers failed to take steps to corroborate the information they had before them. Appellant offers no supporting evidence, however, other than a bare allegation of "malice", that would explain why the officers' alleged omissions were the product of personal ill-will.

The recent case of *Nelson v. Kenny, supra,* 121 Md.App. 482, 710 A.2d 345, also illustrates what is missing from the case *sub judice.* In *Nelson,* we affirmed a decision to deny a motion for summary judgment when a police officer arrested a teacher in a local school following an altercation between the teacher and one of the students. The officer paraded the teacher in handcuffs in front of her colleagues and made personal comments to the teacher that may have indicated a motive of personal animus. Significantly, there was evidence in *Nelson* that the officer may have arrested the teacher because of racially-tinged comments made by the parent of the child the teacher allegedly harmed. The police report said that the child's parent, who was African–American, complained to the police officer "about being black [and] being stepped on, used by white people and cussing that '. . . it does not make good god [sic] damn sense for a white teacher to grab a child like that. . . .'" *Id.* at 490, 710 A.2d 345. We concluded, based on the evidence, that "[i]t would not be unreasonable for a jury to resolve the dispute over [the officer's] motivations and intentions by inferring from the facts that her conduct was inspired by racial hatred and by a desire to harm and humiliate [the teacher] to satisfy that emotion." *Id.* at 495, 710 A.2d 345.

The facts of this case are in marked contrast to *Port Deposit* and *Nelson.* Even if a jury could infer that Murphy and Brooks could have done more to ascertain the suspect's true identity, there is no evidence that they failed to do so out of personal disdain for appellant. Because appellant did not present "with . . . clarity and precision those facts which make the act[s] malicious," *Manders,* 101 Md.App. at 216, 643 A.2d 931, summary judgment on the ground of qualified immunity was appropriate.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**