959 A.2d 816

**Arnold HOUGHTON**

v.

**Cheryl FORREST.**

**No. 2042, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 31, 2008.

16

20

William Phelan (George A. Nilson, City Solicitor, on brief), for Appellant.

James L. Rhodes, Baltimore, for Appellee.

Panel: EYLER, JAMES R., WOODWARD, LAWRENCE F. RODOWSKY, (Ret., specially assigned), JJ.

EYLER, JAMES R., J.

Cheryl Forrest, appellee, filed a tort action in the Circuit Court for Baltimore City against Baltimore City Police Officer Arnold Houghton, appellant, arising out of appellee's arrest. In her complaint, appellee alleged assault, battery, false arrest, false imprisonment, and violations of Articles 24 and 26 of the Maryland Declaration of Rights. Appellant asserted, *inter alia,* immunity from liability. The court submitted appellee's causes of action to a jury by a verdict sheet that required the jury to determine whether appellant had committed each tort and whether he had acted with actual malice in doing so. The jury found that appellant lacked probable cause to arrest appellee, that he committed all of the torts, and as to each, that he acted with actual malice.[1] The jury awarded compensatory, but not punitive, damages.

On appeal, appellant contends that the evidence is legally insufficient to sustain the finding of actual malice. Appellee disagrees and, alternatively, contends that the trial court should not have required her to prove that appellant acted with actual malice, to establish liability, because appellant was not immune from intentional and constitutional torts. Appellant counters by arguing that appellee may not raise the alternative argument on appeal because it was not properly preserved.

We hold that the evidence is legally insufficient to sustain the finding of actual malice. Additionally, we hold that appellee preserved her objection to the trial court's ruling that appellee had to prove actual malice in order to establish liability. We also hold that appellant does not enjoy immunity

---

1. As to each tort, the verdict sheet instructed the jury to find whether appellant "acted without malice," as opposed to a finding that he acted with malice. The jury answered the questions on the verdict sheet in the negative. We perceive those findings to be substantively the same as findings that appellant acted with malice.

from liability, but enforcement of the judgment against him is subject to the Local Government Tort Claims Act (LGTCA), Maryland Code (2006 Repl.Vol.), § 5–507 of the Courts & Judicial Proceedings Article ("C.J."). Under the LGTCA, appellee's failure to prove actual malice prevents her from enforcing her judgment against appellant, but the statute permits appellee to collect the amount of the judgment from the Baltimore City Police Department.

## Factual Background

On May 25, 2005, appellant was in a covert location watching a video monitor. The video monitor showed images produced by several different cameras monitoring an area on Eutaw Street south of Saratoga Street, near Lexington Market.

During appellant's surveillance, he observed a female, wearing a white shirt, buy what he believed were prescription drugs from a seller. Appellant radioed Officer Timothy Williams, a Baltimore City Police Officer, and told him to arrest the seller.

While Officer Williams was moving to arrest the seller, appellant observed the female buyer, wearing a white shirt, hug another female who was dressed in black and carrying a red umbrella. Relying on his training and experience, appellant interpreted this hug as another illegal drug transaction. After observing the hug, appellant switched the view on his monitor to another angle because he wanted to watch Officer Williams arrest the original seller.

Following Officer Williams' arrest of the original seller, appellant returned the view on his monitor to its original location where he had witnessed the hug that he interpreted as a drug transaction. The female wearing a white shirt was no longer in the view of the camera. A female wearing a dark jacket and carrying a red umbrella was in the view of the camera. According to appellant, he did not realize that this female was not the original female wearing black and carrying a red umbrella who engaged in the hug with the female

wearing white. Actually, this female was appellee, waiting for the bus to take her to work. According to appellant, he instructed Officer Williams to arrest appellee because he believed that she was the same person who had engaged in a drug transaction with the female wearing white.

Officer Williams approached appellee and informed her that she had been videorecorded purchasing illegal drugs. Appellee told Officer Williams that she had not purchased any drugs. Officer Williams searched appellee's pockets and checked the ground around appellee, but he found no evidence of drugs. Officer Williams did not see appellee toss, swallow, or destroy any evidence. Nevertheless, Officer Williams detained appellee and transported her to the location of the hug.

At that point, Officer Williams advised appellant that appellee did not have any drugs and asked appellant to check the video to verify that appellee was the correct suspect. Appellant and Officer Williams testified that, after a pause, appellant responded by stating that appellee was the correct suspect. Appellee testified that she heard an unidentified voice—presumably appellant—tell Officer Williams to arrest appellee anyway.

Appellant testified that he instructed Officer Williams to arrest appellee despite the lack of drugs because "when people purchase narcotics, especially prescription pills, they usually eat them right away." In addition, appellant testified that he did not heed appellee's protests because in his experience "virtually everyone says that they weren't involved or they didn't do it. So once I made my identification.... she was going to be arrested based on ... what I thought was going on at the time." In any event, Officer Williams arrested appellee and took her to Central Booking. Appellee spent the night at Central Booking and was released the next day.

On December 8, 2006, appellee sued Officer Williams for damages arising from her arrest.[2] On May 24, 2007, appellee added appellant as a defendant.

---

2. At trial, the jury returned a verdict in favor of Officer Williams, and that result is not challenged on appeal.

On September 20 and 21, 2007, the case was tried before a jury, on claims of assault, battery, false arrest, false imprisonment, and violations of Articles 24 and 26 of the Maryland Declaration of Rights. At trial, appellant moved for judgment and argued that appellant was protected by immunity, and that appellee could overcome appellant's immunity only by showing that appellant acted with actual malice.

The parties submitted proposed jury instructions to the trial judge just before closing argument. Appellant's proposed jury instruction number three required appellee to prove that appellant acted with actual malice, with respect to all torts, to overcome appellant's immunity. Appellee's counsel objected to appellant's proposed jury instruction number three, stating:

> I have an objection to [defendant's] three and it's the same argument that I was makin' in summary judgment, that I don't believe that's the state of the law. The public official immunity, I noticed in his instruction, [*Lee v. Cline*, 384 Md. 245, 863 A.2d 297 (2004) ] is not even mentioned in there at all and that's the case that I believe says that there is no public official immunity for the counts that are left, intentional torts and constitutional torts.

The trial judge then read aloud the portions of Lee on which appellee's counsel relied. Subsequently, the parties argued their positions in detail, after which the following colloquy occurred.

> [APPELLANT'S COUNSEL]: So, Your Honor, . . . three is in?
>
> THE COURT: Yes. Go on.
>
> [APPELLEE'S COUNSEL]: I'm sorry. What was your response, Judge?
>
> THE COURT: My response was yes.
>
> [APPELLEE'S COUNSEL]: My objection is noted.
>
> THE COURT: All right.

At this point, counsel and the trial judge discussed various other objections to the jury instructions and verdict sheet.

Just prior to the finalization of the jury instructions, the following discussion occurred.

[APPELLANT'S COUNSEL]: Your Honor, your, you've made your decision with respect to the jury instructions?

THE COURT: Yes.

[APPELLANT'S COUNSEL]: Okay.

THE COURT: You'll hear them when I give them.

[APPELLANT'S COUNSEL]: Will there be an opportunity for objections?

THE COURT: No. No. You had the opportunity. You told me how you felt. You told me what you objected to. You told me what you wanted and I'm going to give them.

The judge then brought the jury into the courtroom. Appellant rested his case, and the judge instructed the jury. After completing the instructions, the judge called counsel to the bench, and the following dialogue transpired.

THE COURT: That's it. That's all you asked for; is that right?

[APPELLEE'S COUNSEL]: That's correct.

[APPELLANT'S COUNSEL]: Subject to what—

THE COURT: Hmm?

[APPELLANT'S COUNSEL]:—we've already—I think subject to—

[APPELLEE'S COUNSEL]: Our objections to the principle—

[APPELLANT'S COUNSEL]: Yeah, our objections earlier.

THE COURT: What you're objecting to.

[APPELLEE'S COUNSEL]: What we did earlier when we were both objecting to which instructions we didn't want you to give.

THE COURT: I read it the same you ordered.

[APPELLEE'S COUNSEL]: Right. That—

THE COURT: Oh, okay.

[APPELLANT'S COUNSEL]: Some of the things that we didn't, Your Honor.

THE COURT: All right. Thank you very much.

Subsequently, the jury found that appellant committed all torts and acted with actual malice. The jury awarded $180,171.60 in compensatory damages. Appellant moved for judgment notwithstanding the verdict on the ground that the evidence was legally insufficient to sustain the finding of actual malice. The trial court denied the motion. Appellant filed a notice of appeal on October 30, 2007.

## Discussion

### I. *Actual Malice*[3]

 Appellant moved for judgment, and post-trial judgment notwithstanding the verdict, on the ground that the evidence was legally insufficient to create a jury question with respect to actual malice. The standard of review when assessing either motion is whether the trial court was legally correct. *See, e.g., Shabazz v. Bob Evans Farms, Inc.,* 163 Md.App. 602, 643, 881 A.2d 1212 (2005). In determining whether the trial court was legally correct, we must view the evidence and the reasonable inferences to be drawn from it in the light most favorable to the party who opposed the motion, and determine whether the facts and circumstances only permit one inference with regard to the issue presented. *See, e.g., Impala Platinum Ltd. v. Impala Sales (U.S.A.),* 283 Md. 296, 327, 389 A.2d 887 (1978).

 Immunity, if otherwise applicable, can be defeated by proving that the actor acted with actual malice,[4] *i.e.,* "the

---

3. As we shall explain below, even though we conclude that appellee did not have to show actual malice to defeat appellant's claim of immunity from liability, we shall address this issue because it is relevant to the enforcement of the judgment under the LGTCA. *See infra* Part III.

4. The concept of "actual malice," as used in the context of immunity should not be confused with the "actual malice" required to support a claim for punitive damages. *See generally Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992). There is no issue of punitive damages before us. The jury did not award punitive damages, and that result is not being challenged on appeal.

official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately injure the plaintiff.' " [5] *Nelson v. Kenny*, 121 Md.App. 482, 487, 710 A.2d 345 (1998) (quoting *Davis v. DiPino*, 99 Md.App. 282, 290, 637 A.2d 475 (1994), *rev'd on other grounds*, 337 Md. 642, 655 A.2d 401 (1995) (internal quotations and citations omitted)); *see also Penhollow v. Board of Comm'rs for Cecil County*, 116 Md.App. 265, 294–95, 695 A.2d 1268 (1997); *Williams*, 112 Md.App. at 550, 685 A.2d 884; *Manders v. Brown*, 101 Md. App. 191, 216, 643 A.2d 931 (1994), *cert. denied*, 336 Md. 592, 650 A.2d 238 (1994). Malice may be inferred from the circumstances. *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159 (1985). Nevertheless, a plaintiff cannot prove malice

---

**5.** There are five sources of immunity potentially applicable in this case. *See infra* Part III. A plaintiff may overcome each of these types of immunity, if otherwise applicable, by showing actual malice. The definition of actual malice in the context of immunity varies from case to case. *See, e.g., Lee*, 384 Md. at 268, 863 A.2d 297 (defining actual malice in the context of immunity granted by the Maryland Tort Claims Act (MTCA), Maryland Code (2004 Repl.Vol., 2008 Supp.), § 12–101, *et seq.* of the State Government Article ("S.G."), as "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud...." (internal quotation marks omitted) (citations omitted)); *Thacker v. City of Hyattsville*, 135 Md.App. 268, 300, 762 A.2d 172 (2000) (defining actual malice in the context of municipal corporation immunity as requiring "a determination of whether the arresting officer's conduct, given all of the existing and antecedent circumstances, was motivated by ill will, [or] by an improper motive .... [t]hat motive or animus may exist even when the conduct is objectively reasonable." (internal quotation marks omitted) (citations omitted)); *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159 (1985) (defining actual malice in the context of common law immunity as "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff" (internal quotation marks omitted) (citations omitted)). One of the relevant statutes defines actual malice. *See* C.J. § 5–302(b)(2)(i) (defining actual malice in the context of the LGTCA as "ill will or improper motive"). Maryland courts have not drawn a distinction, however, either explicitly or in application, between the different definitions of actual malice. Given the similarity between these varying definitions of actual malice, they are all likely to produce the same result when applied. Therefore, the definition that we are using in this case should be viewed synonymously with other definitions of actual malice in the context of immunity.

merely by asserting that an act "was done maliciously, or without just cause, or illegally, or with wanton disregard, or recklessly, or for improper motive. . . ." *Elliott v. Kupferman*, 58 Md.App. 510, 528, 473 A.2d 960 (1984). Indeed, the plaintiff must present facts that indicate a nefarious motive, ill-will towards the plaintiff, or a history of animosity. *See Nelson*, 121 Md.App. at 493–95, 710 A.2d 345 (holding that a rational inference of actual malice could be drawn when the officer arrested the plaintiff because the officer was inspired by racial hatred and a desire to harm and humiliate the plaintiff); *Town of Port Deposit v. Petetit*, 113 Md.App. 401, 418, 688 A.2d 54 (1997), *cert. denied*, 346 Md. 27, 694 A.2d 950 (1997) (holding that a rational inference of actual malice could be drawn when an officer shot at the plaintiff's tires because he was so enraged by the plaintiff's grossly negligent conduct).

*Green v. Brooks*, 125 Md.App. 349, 725 A.2d 596 (1999) is instructive, with respect to the need to prove ill will or improper motive. In that case, Green's cousin was apprehended for shoplifting. *Id.* at 356–57, 725 A.2d 596. Green's cousin told the arresting officers that he was Green, and provided them with Green's address. *Id.* at 356, 725 A.2d 596. The court set a trial date. *Id.* at 357, 725 A.2d 596. However, neither Green nor his cousin appeared at trial. *Id.* The court issued a bench warrant for Green. *Id.* Consequently, police officers arrested Green. *Id.* at 357–59, 725 A.2d 596. Green was incarcerated for five days before the police discovered that he was not the man who committed the shoplifting offense. *Id.* at 359, 725 A.2d 596. Subsequently, Green sued several members of the police department. *Id.* at 354–55, 725 A.2d 596. The arresting officers moved for summary judgment, asserting immunity and the absence of actual malice. *Id.* at 360–61, 725 A.2d 596. The trial court granted summary judgment. *Id.* at 361, 725 A.2d 596. This Court affirmed, explaining that there was no evidence that the officers who arrested and detained Green were motivated by a nefarious motive, an ill-will toward Green, or a history of animosity with Green. *Id.* at 378–80, 725 A.2d 596. Rather, the officers

merely failed to take steps to corroborate the information that they had before them. *Id.* at 379, 725 A.2d 596.

 In the case before us, appellee was arrested and detained after she was mistaken for a suspect, and appellant failed to corroborate that appellee was the correct suspect. As in *Green*, appellee failed to present evidence giving rise to a reasonable inference that appellant was motivated by a nefarious motive, an ill-will toward appellee, or a history of animosity with appellee. Rather, the evidence indicates that appellant merely failed to take steps to confirm that appellee was the correct suspect.

As at trial, on appeal, appellee relies heavily on *Lee v. Cline.* *Lee*, however, illustrates a critical element that is missing from this case. In *Lee*, the Court of Appeals held that a jury rationally could infer that an officer acted with actual malice because the facts indicated that the officer acted with ill-will toward the plaintiff. *Id.* at 267–70, 863 A.2d 297. Specifically, the officer pulled over a luxury car driven by a plaintiff who was African–American; requested to search the plaintiff's car when there was no basis for the search; told the plaintiff that he did not need permission to search the car when the plaintiff refused to consent to the search; insisted on obtaining a canine unit despite the fact that there was no evidence of drugs or other violations of law, and the plaintiff did not have a criminal history; "yelled" at the plaintiff to remain in his car; detained the plaintiff for twice the amount of time than he should have detained him; and referred to the plaintiff as an uncooperative suspect. *Id.* at 269–70, 863 A.2d 297. In so holding, the Court pointed out that "intent and motive are critical to the question of malice." *Id.* at 269, 863 A.2d 297. The evidence permitted an inference that the arresting officer was motivated by ill-will and improper motive because he prolonged the stop as a result of the plaintiff's refusal to consent to a search, requested a search without a basis, advised the plaintiff that he could search the vehicle without the plaintiff's permission, called a canine unit, yelled at the

plaintiff, and labeled the plaintiff uncooperative. *Id.* at 270, 863 A.2d 297.

In the case before us, there is no evidence from which a jury could draw a rational inference that appellant intended to hurt appellee, or acted with any type of ill-will toward appellee. Appellee asserts that appellant instructed Officer Williams to arrest her knowing that she was not the correct suspect. Appellee failed to provide any evidence, however, that appellant in fact knew that he had requested the wrong person to be arrested, as distinguished from a belief that appellee was the suspect.

Appellant testified that, at some point prior to trial, he viewed the surveillance videodisc and, based on that review, admitted that he had made a mistake when he confused appellee with the suspect, at the time of arrest. The videodisc was admitted into evidence and shown to the jury. Appellee argues that viewing the videodisc could lead a jury to believe that appellant knew that he had caused the wrong person to be arrested, tried to find the correct person, and when he could not do so, gave false information to Officer Williams to include in a statement of probable cause. This Court has viewed the videodisc, and we conclude that it does not permit such an inference. The disc depicts what reasonably could be interpreted as drug transactions. Appellant misidentified one of the participants. Moreover, there is no evidence that appellant knowingly gave false information to Officer Williams to include in a statement of probable cause. Accordingly, we hold that the evidence is legally insufficient to sustain a finding of actual malice.

## II. *Preservation*

Appellee argues that, even if the evidence is legally insufficient to sustain the finding of actual malice, the judgment should be affirmed because appellant does not enjoy immunity, in the absence of malice. Appellant argues that this Court should not address this issue because appellee failed to object to the trial court's jury instruction on immunity after the instruction was given.

 Maryland Rule 2–520(e) requires that objections to jury instructions be made "on the record promptly after the court instructs the jury. . . ." The purpose of the rule is "to enable the trial court to correct any inadvertent error or omission in the [instructions], as well as to limit the review on appeal to those errors which are brought to the trial Court's attention." *Fisher v. Baltimore Transit Co.*, 184 Md. 399, 402, 41 A.2d 297 (1945). Generally, objections under this rule must be precise because the trial judge must know the exact nature and grounds of the objection to correct the instructions. *Hoffman v. Stamper*, 385 Md. 1, 39–40, 867 A.2d 276 (2005). However, counsel need not make a precise objection after the instructions are read to the jury when "the ground for objection is apparent from the record and the circumstances[,] . . . such that a renewal of the objection after the court instructs the jury would be futile or useless." *Gore v. State*, 309 Md. 203, 208–09, 522 A.2d 1338 (1987); *Sergeant Co. v. Pickett*, 283 Md. 284, 288–89, 388 A.2d 543 (1978). Indeed, substantial compliance with Rule 2–520(e) is sufficient. *Forrest v. P & L Real Estate Inv. Co.*, 134 Md.App. 371, 408, 759 A.2d 1187 (2000); Gore, 309 Md. at 209, 522 A.2d 1338; *Moats v. Ashburn*, 60 Md.App. 487, 492, 483 A.2d 791 (1984) (citing *Bennett v. State*, 230 Md. 562, 569, 188 A.2d 142 (1963)). In other words, an objection is preserved for appellate review even if the objection is not raised after the jury instructions are given, as long as it is "crystal clear" that there is an ongoing objection to the instruction. *See Sims v. State*, 319 Md. 540, 549, 573 A.2d 1317 (1990).

 Two contrasting cases adequately illustrate what constitutes "substantial compliance" with Rule 2–520(e). In *Haney v. Gregory*, 177 Md.App. 504, 509, 520, 936 A.2d 388 (2007), this Court held that the plaintiff's objection to one of the defendant's instructions was preserved when the plaintiff objected to the instruction at a conference on the jury instructions, but failed to object to the instruction after the trial judge gave the instruction to the jury. *See also Corbin v. State*, 94 Md.App. 21, 27 n. 2, 614 A.2d 1329 (1992) (holding that defendant's objection to a jury instruction was preserved

**32**

when defendant made the objection at the close of evidence and just before the trial judge instructed the jury, but failed to renew the objection after the trial judge instructed the jury). The Court reasoned that nothing transpired at or after the conference on instructions that would have lead anyone to believe that the plaintiff conceded his objection. *Haney,* 177 Md.App. at 520, 936 A.2d 388. Conversely, in *Sims,* the Court held that defendant's objection was not preserved when it was "difficult, if not impossible, to determine whether defense counsel acquiesced in the judge's determination that [defendant's objection was improper,] or . . . whether . . . counsel decided to abandon the [objection] as a matter of sound trial tactics[,] or . . . whether he intended to persist in his [objection]." 319 Md. at 549, 573 A.2d 1317; *see also Black v. Leatherwood Motor Coach Corp.,* 92 Md.App. 27, 34 n. 4, 606 A.2d 295 (1992) (applying *Sims* in a civil context), *cert. denied,* 327 Md. 626, 612 A.2d 257 (1992). These two cases indicate that an objection to a jury instruction is preserved, despite the lack of an objection following the delivery of the instruction, as long as the objecting party substantially complies with Rule 2–520(e) by making it crystal clear that he has not conceded his objection to the jury instructions.

 An examination of the transcript reveals that appellee substantially complied with Rule 2–520(e) because he made his objection to the trial court's immunity instruction crystal clear. Appellee espoused his position at various times during the trial, including during the discussion of jury instructions. The trial judge clearly ruled against appellee, gave the immunity instruction with respect to the need for actual malice, and included the question on the verdict sheet. The trial judge made it clear that any further objection would be futile and useless when he informed the parties that they would not have an opportunity to object to the instructions after the instructions were read to the jury. Furthermore, as in *Haney,* nothing transpired between the initial argument over the jury instructions and the actual reading of the jury instructions that would lead anyone to believe that appellee conceded his objection. 177 Md.App. at 520, 936 A.2d 388. After the trial

judge read the instructions to the jury, appellee made it crystal clear that he did not concede his initial objection when he asked the trial judge whether the instructions were subject to "[o]ur objections on principle." In fact, appellant also confirmed that appellee's objection still existed when he asked the trial judge whether the instructions were subject to "*our* objections earlier" (emphasis added). Therefore, the transcript reveals that it was crystal clear to everyone that appellee never conceded his objection to the trial court's immunity instruction and question on the verdict sheet. Consequently, we conclude that appellee substantially complied with Rule 2–520(e) and properly preserved for appellate review his objection to the trial court's immunity instruction and question on the verdict sheet.

## III. *Source of Immunity*

It is difficult to determine whether the trial court applied common law or statutory immunity, and if statutory, which statute. The potentially applicable sources of immunity are common law public official immunity, statutory immunity for officials of municipal corporations, statutory immunity for officials of special taxing districts, the MTCA, and the LGTCA. The lack of clarity in the record is inconsequential because the application of governmental immunity involves the interpretation and application of Maryland statutory and case law, meaning that we conduct a de novo review. *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006).

### A. *Common Law Public Official Immunity*

In order for common law public official immunity to apply (1) the actor must be a public official, and not a mere government employee or agent; (2) the conduct must have occurred while the actor was performing discretionary, and not ministerial, acts; and (3) the actor must have performed the relevant acts within the scope of his official duties. *James v. Prince George's County*, 288 Md. 315, 323, 418 A.2d 1173 (1980). Common law public official immunity does not apply if the official acted with actual malice. *Leese*, 64 Md.App. at

479–81, 497 A.2d 159. In addition, common law public official immunity does not apply if the official committed an intentional or constitutional tort. *Lee*, 384 Md. at 258, 863 A.2d 297.

■ In this case, appellant was a public official performing discretionary acts within the scope of his employment but does not enjoy common law public official immunity because all of the torts committed by appellant were intentional and constitutional torts.

### B. *Officials of Municipal Corporations*

■ Officials of municipal corporations are immune when they commit a tort, without malice, while acting in a discretionary capacity, within the scope of their employment. C.J. § 5–507; *see also id.* § 1(b) (stating that officials of municipal corporations shall have the immunity described in C.J. § 5–507.). Municipal corporations are cities, towns, and villages created under any general or special State law and are subject to Article XI–E of the Maryland Constitution. Md. Ann.Code (1957, 2005 Repl.Vol.), Art. 23A, § 9.

The Baltimore City Police Department is a state agency, not a municipal corporation, and its officers are state officials, not municipal officials. *Clea v. Mayor of Baltimore*, 312 Md. 662, 668, 541 A.2d 1303 (1988); *see also Ashton v. Brown*, 339 Md. 70, 104 n. 18, 660 A.2d 447 (1995) (noting that "[t]he [Baltimore City Police Department], for purposes of Maryland law, is a state agency" (citation omitted)); *Cherkes*, 140 Md.App. at 303–13, 780 A.2d 410 (explaining why the Baltimore City Police Department is considered a state agency); Therefore, because appellant is not a municipal official, he does not enjoy immunity under § 5–507.[6]

---

6. Appellant does not enjoy municipal corporation immunity for another reason. The statute codified common law public official immunity with respect to officials of municipal corporations; thus the municipal corporation immunity, if otherwise applicable, does not extend to intentional and constitutional torts. *See supra* Part III.A (stating that common law public official immunity does not apply to intentional and constitutional torts); *see also infra* Part III.C (discussing how § 5–507

## C. *Officials of Special Taxing Districts*

Appellant argues that C.J. § 5–511 applies in this case. That section provides immunity to "an official of a governmental entity, while acting in a discretionary capacity, without malice, and within the scope of the official's authority." C.J. § 5–511(b). In this case, the relevant operative language in this statute is the term "official of a governmental entity." Appellant argues that this statute applies because he is an "official of a governmental entity" by virtue of his status as a common law public official.

Without analyzing in detail the applicability of § 5–511, several cases have suggested that this statute applies to governmental public officials generally. *Lee,* 384 Md. at 260 n. 2, 863 A.2d 297; *Lovelace v. Anderson,* 366 Md. 690, 704, 785 A.2d 726 (2001). In fact, two cases explicitly extended immunity under § 5–511 to Baltimore City Police Department officers: *Lovelace,* 366 Md. at 704, 785 A.2d 726; *Williams,* 359 Md. at 131, 138, 753 A.2d 41 (stating that "[g]enerally, [Baltimore City Police Department] Officer Colbert . . . falls under the purview of section 5–511(b) and qualifies for immunity from civil liability").

■ Despite the above cases, the language in § 5–511 indicates that it does not apply to governmental public officials generally. Rather, the language of § 5–511 indicates that it merely extends immunity [7] to officials of special taxing districts. Section 5–511 applies to "official[s] of a governmental entity." C.J. § 5–511(b). It does not refer to public officials generally. Consistently, Article 26, § 2 provides that "[o]fficials of a governmental entity shall have the immunity from liability described under § 5–511 of the Courts and Judicial Proceedings Article." Section 5–511 defines "official of a governmental entity" as it is defined in Article 26, § 1 of the Maryland Code. C.J. § 5–511(a)(2). Article 26, § 1 of the

---

did not expand the nature and extent of the torts to which immunity applied beyond the original common law boundaries).

7. The nature and extent of this immunity is discussed below.

Code defines "official of a governmental entity" as a member of the governing body of a governmental entity. Md. Ann. Code (1957, 2005 Repl.Vol.), Art. 26, § 1(c). "Governmental entity" is defined as "a *special taxing district*," which:

(1) Is a unit of government responsible for an area situated solely within a single county;

(2) Has a governing body elected independently of the county government;

(3) Is financed with revenues secured in whole or in part from special taxes or assessments levied on real property situated within the area;

(4) Performs municipal services for the residents of the area; and

(5) Was not created for a limited or special purpose or purposes.

*Id.* § 1(b). The Baltimore City Police Department does not fall within that definition.

The legislative history of § 5–511 also indicates that it was not intended to apply to governmental public officials generally. Section 5–511 has its roots in *Smith v. Edwards,* 46 Md.App. 452, 418 A.2d 1227 (1980), *rev'd on other grounds, Smith v. Edwards,* 292 Md. 60, 437 A.2d 221 (1981). In *Smith,* we held that officials of special taxing districts were not immune from liability. *Id.* at 460, 418 A.2d 1227, *abrogated by* C.J. § 5–511. On appeal, the Court of Appeals did not address the immunity question. *Smith,* 292 Md. at 73 n. 5, 437 A.2d 221.

At that time, the General Assembly maintained an Advisory Board on Liability "to study the issue of liability of individuals engaged in activities of State and local government and quasi-governmental volunteer units." James Lightizer, Report of the Advisory Board on Liability, H.B. 908, at 1 (1982). After the Court of Appeals' opinion in *Smith,* the Advisory Board drafted House Bill 908 to provide immunity to officials of special taxing districts. Letter from Stephen H. Sachs to Governor Hughes, May 27, 1982, H.B. 908 (1982).

The Advisory Board also submitted a report to the General Assembly regarding H.B. 908. Lightizer, *supra.* The Advisory Board's report never mentioned codifying the common law public official immunity doctrine as a whole. *See id.* Instead, the report focused solely on the codification of immunity for officials of special taxing districts. For example, the Advisory Board described its purpose as determining "whether those individuals serving on governing boards [of special taxing districts] are entitled to public official immunity." *Id.* at 2. The Advisory Board also described a public hearing that it held concerning proposed H.B. 908. *Id.* The Advisory Board invited 120 special tax districts to the hearing. *Id.* The Advisory Board report did not list anyone else who was invited to the hearing, suggesting that the legislation was meant to affect only special taxing districts. *See id.* The Advisory Board's report also explicitly stated that it drafted and endorsed H.B. 908 because it was "convinced that there is . . . an unclear shield of immunity available to individuals serving special taxing district advisory boards. . . ." *Id.* at 3.

The words of the General Assembly also are instructive regarding the purpose of H.B. 908. For example, when the General Assembly finally enacted H.B. 908, the General Assembly specifically stated that its purpose was to "provid[e] a certain immunity from suit to officials of a special taxing district under certain circumstances. . . ." H.B. 908, purpose (1982). Furthermore, the preamble of H.B. 908 stated that it "intends to retain the decisional law definition of a public official but seeks to supplement that definition under this section by statutory definition, so as to include persons who otherwise might fail to be categorized as a public official." *Id.* preamble. These words of the General Assembly clearly indicate that H.B. 908 did not codify the common law public official immunity doctrine as a whole.

H.B. 908's bill file also contains other documents that shed light on the statute's purpose. For example, H.B. 908's fiscal notes state that "the bill has no impact on State revenues and expenditures" because it pertains to local agencies. Revised Fiscal Note, Mar. 8, 1982, H.B. 908 (1982). In addition, H.B.

908's bill file contains letters from constituents in support of the legislation. Letter from John W. Coche, Jr., Treasurer, Annapolis Roads Property Owner's Association, to Committee Members, Judiciary Committee, House of Delegates, Mar. 10, 1982, H.B. 908 (1982); Letter from Tom Basil, Maryland Association of Counties, Inc., to House Judiciary, House Constitutional, and Administrative Law Committees, Mar. 10, 1982, H.B. 908, at 1 (1982). Nearly all of the letters are from officials of special taxing districts. The fact that officials of special taxing districts were the only constituents interested in H.B. 908 suggests that the General Assembly enacted the bill to affect special taxing districts. The above information suggests that the statute did not codify common law public official immunity as a whole, but rather extended immunity to officials of special taxing districts.

A handwritten notation within the bill file of H.B. 908 points out that the language of § 5–511 is "almost verbatim from immunity § for municips." Unnamed Handwritten Notes, H.B. 908, at 1 (1982). Thus, we examine the legislative history of the municipal corporation immunity statute, § 5–507, to determine the General Assembly's intent when it enacted the language later used in § 5–511.

As in the case of § 5–511, the legislative history of § 5–507 does not state or imply that the General Assembly intended to codify the common law public official immunity doctrine as a whole. Rather, legislative history of § 5–507 indicates that it extended immunity to officials of municipal corporations. Section § 5–507 was enacted in 1979 "in response to a growing concern that the increased challenges of individual *municipal* officials in the courts [would] result in a decline of individual willingness to serve in elected positions." Statement by the Maryland Municipal League on S.B. 820 and H.B. 1475, Mar. 16, 1979, H.B. 1475, at 1 (1979) (emphasis added). This statement implies that § 5–507 was not enacted in response to a growing concern that the increased challenges of all *public* officials would discourage people from serving in elected positions. Additionally, when the General Assembly enacted § 5–507, the General Assembly specifically stated that its purpose

was to "provid[e] officials of *municipal corporations* with qualified immunity. . . ." H.B. 1475, preamble (1979) (emphasis added).

Furthermore, the bill file to § 5–507 contains a number of letters and statements from constituents in support of the legislation. Letter from Robert W. O'Connor, Mayor, Cheverly, Md., to the Honorable J. Joseph Curran, Chairman, Senate Judicial Proceedings, Mar. 5, 1979, H.B. 1475 (1979); Letter from Guy W. Parks, President, Commissioners of St. Michaels, to the Honorable J. Joseph Curran, Chairman, Senate Judicial Proceedings Committee, Feb. 27, 1979, S.B. 820 (1979); Statement of the Council of the City of Bowie, Maryland before the Judicial Proceedings Committee, Mar. 16, 1979, S.B. 820 (1979). Nearly all of the letters and statements are from officials of municipal corporations. The fact that officials of municipal corporations were the only constituents interested in § 5–507 suggests that the General Assembly enacted the bill to affect municipal corporations.

Lastly, all of the documents in § 5–507's bill file mention the concept of immunity in connection with municipal corporation officials only. The above information suggests that § 5–507 did not codify common law public official immunity as a whole. Rather, § 5–507 extended immunity to municipal corporation officials. Therefore, § 5–511's use of § 5–507's language does not indicate that the General Assembly intended to extend public official immunity to all governmental public officials when enacting § 5–511.

■ Despite the above analysis, we do not need to rely on it because appellant's reliance on § 5–511 fails for another reason. Specifically, if § 5–511 applies to governmental public officials, it does not apply to intentional and constitutional torts.

The cases that have assumed or stated that § 5–511 applies to governmental public officials generally also have assumed or stated that, when it applies, the nature and extent of immunity provided is the same as the nature and extent of common law public official immunity, *i.e.*, the statute codified

the common law. *See Lee,* 384 Md. at 260 n. 2, 863 A.2d 297; *Lovelace,* 366 Md. at 704, 785 A.2d 726. In support of this assertion, these cases rely on dicta in footnote 23 of *Ashton,* where the Court stated:

[the] materials in the bill file from the Department of Legislative Reference suggest that the purpose of the [municipal corporation immunity] statute [CJP § 5–507] was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries. The statute, first enacted in 1979 as Art. 23A, § 1B, of the Maryland Code, was precipitated by concern that some cases of the time threatened the concept of public official immunity for local government officials. The intent of the General Assembly in enacting the statute was apparently to protect common law public official immunity in the face of a perceived threat that it would be eliminated by judicial decision.

339 Md. at 116 n. 23, 660 A.2d 447.

Consistent with footnote 23, the legislative history of § 5–507 indicates that it merely intended to codify the existing common law and make it applicable to municipal officials. Letter from Stuart G. Buppert, II, to Eugene A. Edgett, Sept. 5, 1979, H.B. 1475 (1979) (stating that § 5–507 "was reflective of current case law"); Statement by the Maryland Municipal League, *supra,* at 3 (stating that § 5–507 is meant "to codify existing Maryland case law on immunity for municipal officials"). Common law public official immunity does not apply to intentional and constitutional torts. *See supra* Part III.A. Thus, § 5–507's legislative history indicates that it does not apply to intentional and constitutional torts.

Footnote 23 does not refer to § 5–511, and § 5–511's legislative history does not mention whether it intended to maintain common law immunity's traditional boundaries. However, § 5–511 uses the exact same language as § 5–507, indicating that § 5–511 intended to maintain common law's boundaries, and thus does not apply to intentional and constitutional torts either. *See also Lee,* 384 Md. at 258, 863 A.2d 297 (stating

that § 5–511 is a codification of common law, and that common law immunity did not apply to intentional and constitutional torts). In this case, the jury found that appellant committed intentional and constitutional torts. *See supra* Part III.A. Therefore, appellant does not enjoy immunity under § 5–511.

### D. *Maryland Tort Claims Act*

The MTCA provides immunity to "state personnel" who commit tortious acts within the scope of their employment and without malice or gross negligence. *See* S.G. § 12–105; C.J. § 5–522. The MTCA provides immunity to "state personnel" for both intentional and constitutional torts. *Lee,* 384 Md. at 255–67, 863 A.2d 297. However, employees of the Baltimore City Police Department are not considered "state personnel" for the purposes of the MTCA. *Cherkes,* 140 Md. App. at 325, 780 A.2d 410; *State v. Meade,* 101 Md.App. 512, 522–24, 647 A.2d 830 (1994) (explaining why the MTCA was amended in 1989 to exclude the BCPD from the definition of "state personnel"). Therefore, the MTCA does not provide immunity in this case because appellant is an employee of the Baltimore City Police Department.

### E. *Local Government Tort Claims Act*

The LGTCA applies to suits against a local government or an employee of a local government arising from events occurring on or after July 1, 1987. C.J. § 5–301; *Thomas v. Annapolis,* 113 Md.App. 440, 457, 688 A.2d 448 (1997). An employee is statutorily defined as "any person who was employed by a local government at the time of the act or omission giving rise to potential liability against that person." C.J. § 5–301(c)(1). Although the Baltimore City Police Department is a state agency, it is considered a "local government" for the purposes of the LGTCA. C.J. § 5–301(d)(21); *Smith,* 400 Md. at 111 n. 6, 928 A.2d 795; *Brown v. Mayor & City Council,* 167 Md.App. 306, 316, 892 A.2d 1173 (2006) (recognizing that although the Baltimore City Police Department is a state agency, it is a local government within the meaning of the LGTCA); *Cherkes,* 140 Md.App. at 325, 780 A.2d 410 (explaining why the Baltimore City Police Depart-

ment is considered a local government for the purposes of the LGTCA, despite typically being considered a state agency under Maryland law). Likewise, employees of the Baltimore City Police Department are local government employees entitled to the protection and immunity provided by the LGTCA. *Smith*, 400 Md. at 111 n. 6, 928 A.2d 795. The LGTCA applies to all tort claims, including intentional and constitutional torts. *See id.* at 130, 928 A.2d 795 (stating that the LGTCA's protection "does not appear to exclude liability for intentional torts"); *DiPino*, 354 Md. at 49–56, 729 A.2d 354; *Ashton*, 339 Md. at 107–08 n. 19, 123–24, 660 A.2d 447; *see also Lee*, 384 Md. at 258, 863 A.2d 297 (describing *DiPino* and *Ashton* as "[h]olding that there was coverage under the [LGTCA] for certain intentional and constitutional torts"); *Thomas*, 113 Md.App. at 457, 688 A.2d 448.[8] In this case, appellant was employed by the Baltimore City Police Department at the time of the tortious act. Thus, the LGTCA applies.

If an employee commits a tort within the scope of employment and without actual malice, the LGTCA protects the employee from the execution of any judgment against the employee. C.J. § 5–302(b). Appellant was acting within the scope of his employment, and thus, in light of our holding that the evidence was legally insufficient to sustain the finding of actual malice, appellee cannot execute on the judgment against appellant.

■■■ Nevertheless, the LGTCA allows plaintiffs to enforce a judgment against the employee's local government employ-

---

8. In addition to the aforementioned requirements, the LGTCA requires plaintiffs to provide notice to local governments of a potential suit under the LGTCA within 180 days of the injury. C.J. § 5–304(b); *see White v. Prince George's County*, 163 Md.App. 129, 143–49, 877 A.2d 1129 (2005) (discussing the LGTCA's notice requirement). Even when notice is not given within 180 days of injury, a court may entertain a suit under the LGTCA if the plaintiff shows good cause and the defendant fails to show that its defense has been prejudiced by the lack of required notice. C.J. § 5–304(d). This Court was unable to locate any type of notice in the record, other than the initial complaint that was filed on December 8, 2006—over 18 months after the original injury. However, the issue of notice was not raised by either party.

er, regardless of whether the defendant committed an intentional or constitutional tort, with or without malice.[9] C.J. § 5–303(b). In addition, the LGTCA requires the local government employer to assume the costs of defending the employee. C.J. § 5–302(a). In holding local governments liable for their employees' torts, the LGTCA allows local governments to assert common law public official immunity as a defense if the employee possessed common law public official immunity. *See* C.J. §§ 5–303(e). As discussed earlier, appellant did not possess common law public official immunity. *See supra* Part III.A. Thus, the Baltimore City Police Department may not assert common law public official immunity as a defense. Therefore, appellee may collect the amount of her judgment from the Baltimore City Police Department, assuming no bar to such recovery exists that has not been brought to our attention.

## Conclusion

We hold that the evidence was legally insufficient to sustain a finding of actual malice. Appellee adequately preserved her objection to the trial court's requirement that appellee prove actual malice. Appellee cannot enforce her judgment against appellant, but she may collect from the Baltimore City Police Department, as permitted by the LGTCA.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE BALTIMORE CITY POLICE DEPARTMENT.**

---

**9.** Local governments are only liable for compensatory damages and their liability is capped at $200,000 per individual claim, and $500,000 total for claims that arise from the same occurrence. C.J. § 5–303(a), (c). In this case, the jury assessed $180,176.60 in compensatory damages. Therefore, the cap is not implicated.